THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RAYMOND SCOTT *et al.*, Defendants-Appellants.

(No. 58206;

First District (3rd Division)—November 7, 1974.

James J. Doherty, Public Defender, of Chicago (Leonard V. Soloman, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Thomas A. Mauet, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

After a jury trial, defendants Raymond Scott and Frank Watson were found guilty on six counts—two of armed robbery, two of attempted murder, and two of aggravated battery. Sentences were imposed on each count, to run concurrently. Defendants filed separate appeals. Three contentions are urged on appeal by each defendant which are similar and consolidated for consideration:

(1) The photographic identifications were so highly suggestive and conducive to irreparable mistaken identification as to deny due process of law.

(2) There was no independent basis for the in-court identification.

(3) The evidence was insufficient to establish guilt beyond a reasonable doubt.

Defendant Watson raises four additional contentions:

(4) The photographic identification of Watson was improper in utilizing a procedure less reliable than available corporeal procedure in which Watson would be entitled to representation by counsel.

(5) The trial court erred in failing to limit an instruction as to circumstantial evidence to defendant Scott.

(6) The closing arguments of the prosecutor were improper and solely to arouse sympathy of the jury.

(7) The conviction and sentencing for six separate offenses which arose out of the same transaction are improper.

In his brief to this court, defendant Scott has listed nine additional errors for reversal but has set forth argument only as to the first three contentions above enumerated. Supreme Court Rules 612(j) and 341(e)(7) apply and provide that points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing. (Ill. Rev. Stat. 1973, ch. 110A, pars. 612(j) and 341(e)(7).) Accordingly, except as to the seventh contention above set forth, which we determine as plain error affecting substantial rights under Supreme Court Rule 615(a), the additional errors listed by defendant Scott without argument are deemed waived and will not be considered by this court. The pertinent facts follow.

At approximately 6:30 P.M., on April 6, 1970, four young male Negroes entered the E & L Tap, located at 48th Court and 29th Avenue in Cicero,

Illinois. Soon after entering, one of them jumped onto the bar, brandished a shotgun, and announced a "stick-up" to the 10 or 15 patrons. The other three offenders, all armed with handguns, then positioned themselves at the front, middle and rear of the tavern. The one with the shotgun jumped down behind the bar and tried to open the electric cash register. The bartender, Ronald Pluth, informed him that it would not open because it was not plugged into the outlet. Pluth then walked over and plugged it in, and after watching the offender remove the contents, turned to walk back to his original position. At this point, a shot was fired in the rear of the tavern, and the offender with the shotgun immediately fired at Pluth, striking him in the right buttock. More shots were fired as the patrons scattered and fell to the floor for protection. The four offenders fired shots at the patrons on the floor as they ran out of the tavern. They entered a 1963 Ford sedan and drove down the street a distance of 50 feet. They then abandoned the vehicle, ran down the alley, and drove away in another automobile. In addition to Pluth's injury, gunshot wounds were received by Lorraine Kaczmarek, the owner of the tavern, and two patrons, Daniel Lapinski and Dale Mertes. Defendants Scott and Watson were subsequently indicted and brought to trial.

Dianne Kaczmarek testified for the prosecution. She was standing at the rear of the tavern talking with her mother, Lorraine Kaczmarek, when the four men entered. The interior was lighted and it was still light outside. The four offenders were in the tavern an estimated 10 minutes. Defendant Scott was identified by her in court as the one who positioned himself at the rear of the tavern next to her and her mother. It was Scott who had shot her mother. She identified Watson as the one who stationed himself in the middle of the tavern about 6½ feet from where she was standing. During the holdup he shoved patron Frank Wausak against a door and frisked him. On April 7, 1970, the witness identified defendant Watson's photograph from a group of 20 pictures of male Negroes of varying ages shown to her by the police at her mother's home. Some were of old men. She never gave the police a description of any of the offenders but merely picked out defendant Watson's photograph. She viewed them in her mother's bedroom after they had been shown to her mother.

Lorraine Kaczmarek, owner of the tavern, testified. She was standing at the rear of the tavern talking to her daughter when the four men entered. The interior was lighted and she was able to see the people without any difficulty. She identified defendant Scott in court as the one who positioned himself about 5 feet from where she and her daughter were standing. She identified Watson in court as the one who stood directly behind Scott and nearer to the center of the bar, some 10 to 15 feet away from her. The four offenders were inside the tavern for an

estimated 10 minutes before any shots were fired. During this time Scott was standing face to face with her, and she concentrated on his face and Watson's. After the one with the shotgun began scooping the money out of the register she became very nervous and her knees buckled causing her to fall back onto some beer cases. Defendant Scott said to her, "Where are you going, bitch?" He fired a shot over her shoulder, then fired again, striking her in the left hip. More shots were fired and the four offenders ran from the tavern. She never gave the police a description of the four men. After her release from the hospital, two police officers came to her home and showed her a group of loose photographs. She picked one of defendant Scott. Her daughter Dianne was not in the bedroom when she viewed the photographs but came in afterwards, and Lorraine was present when Dianne viewed the same photographs.

Albert Klucina, a Cicero Police Department patrolman, testified. He was the investigating officer on April 6, 1970, and arrived at the tavern about 6:30 P.M. The shotgun used in the robbery was recovered inside, but had no fingerprints on it. The 1963 Ford sedan initially used to flee the scene was recovered about 50 feet from the tavern. In the glove compartment he found a bill of sale and a repair bill in the name of defendant Scott. It was later established that the vehicle was registered in the name of Scott. The automobile was wired to operate with or without an ignition key. A check disclosed that no theft report of the vehicle had been made. The officer did not received a description of the offenders from any of the wounded patrons, but descriptions given by the uninjured patrons were taken by other officers and later relayed to him. He ordered photographs from the Chicago Police Department within 2 or 3 hours after the robbery and specifically asked for a photograph of Raymond Scott. After Lorraine Kaczmarek was released from the hospital Klucina and another officer went to her home and showed her the photographs. Although Dianne Kaczmarek was in the house at the time, she was not in the same room. She later went into the room and viewed the same photographs while her mother was present.

Ronald Pluth, the bartender, testified. The lighting conditions in the tavern were adequate and he could see without difficulty. He identified defendants Scott and Watson in court as two of the four who had robbed the tavern. The closest he came to defendant Watson during the robbery was 5 or 6 feet. After he plugged in the cash register and watched the man with the shotgun remove the contents, he turned and walked away. A shot was heard and he was then shot in the buttocks by the offender with the shotgun. A colostomy was required, but this condition was corrected by further surgery. He never gave the police a description of

the offenders, but 3 or 4 weeks after the robbery, following his release from the hospital, he viewed a series of photographs brought to his home by the police. He picked out photographs of defendants Scott and Watson. The police did not inform him that the Kaczmareks had previously identified their photographs. He made his in-court identification of the two defendants on the basis of their facial features.

The record is silent as to whether defendant Watson was in custody at the time Pluth identified his photograph, but does establish that defendant Scott was not then in custody.

Four other patrons who were in the tavern during the robbery testified, but could not identify either of the defendants. Two persons who were walking down the street and observed the four offenders running from the tavern also testified, but could not identify either of the defendants.

Defendant Scott testified in his own behalf. He was the owner of the 1963 Ford sedan recovered at the scene of the robbery, but it had been stolen from in front of his home about 3 days prior to April 6, 1970. He did not work on April 6, and in the afternoon drove his father's 1966 Pontiac to Melvin Rainey's home at 106th and State Streets, Chicago. From there he and Rainey drove to Dennis Gregory's home at 133rd and Blue Island Streets in Blue Island. Both Rainey and Gregory were his friends and co-workers. They played cards and talked at Gregory's home until 8 P.M., during which time Gregory's wife and children came home. He did not surrender to police until 1 month and 3 weeks after he learned he was being sought in connection with the robbery.

Melvin Rainey and Dennis Gregory testified to substantially the same facts as defendant Scott. However, Rainey was uncertain as to the month and year he and Gregory had played cards with Scott in the Gregory home, but he thought it was the second or third Monday in April 1970.

Defendant Watson also testified in his own behalf. He missed his ride to work on April 6, 1970, and returned to his mother's home where he was then living. He arrived there about 3 P.M. and stayed the rest of the day. His mother, Guinevere Watson, returned home from work at about 5:30 P.M., and around 7 P.M., he admitted Arvesta Greer, a family friend, into the apartment. He testified that before April 6, 1970, he had not known defendant Scott.

Guinevere Watson testified. She returned home from work on April 6, 1970 at 5:25 P.M., and found her two sons, Frank and Jerry, and her niece and grandson in the apartment. At about 7 P.M., Arvesta Greer came over. He was a family friend who also repaired appliances and he was returning a phonograph amplifier he had repaired. Greer stayed about an hour and a half. Her son Frank did not leave the apartment until after Greer left.

Arvesta Greer testified. He arrived at the apartment at 7 P.M., on April 6, 1970, and was admitted to the apartment by defendant Frank Watson. He had gone there to return an amplifier he had repaired. He knows defendant Watson very well and could not have confused him with his brother Jerry.

Prior to trial, all reference to lineup identifications of the defendants was suppressed. At trial, an order was entered upon the prosecution to produce the group of photographs viewed by Dianne Kaczmarek, Lorraine Kaczmarek and Ronald Pluth. They were not produced and the record is silent as to any reason for the noncompliance.

The jury found each of the defendants guilty of the following offenses: armed robbery of Lorraine Kaczmarek, armed robbery of Ronald Pluth, attempted murder of Lorraine Kaczmarek, attempted murder of Ronald Pluth, aggravated battery of Daniel Lapinski, and aggravated battery of Dale Mertes. Six sentences were imposed on each defendant for a term of years to be served concurrently as follows: Defendant Raymond Scott, two armed robberies 15 to 20 years each; two attempted murders 10 to 20 years each; and two aggravated batteries 5 to 10 years each. Defendant Frank Watson, two armed robberies 10 to 20 years each; two attempted murders 8 to 15 years each; and two aggravated batteries 3 to 9 years each. We now proceed to consider defendants' contentions on appeal.

## I.

■■■ Defendants first contend that the photographic identification by Dianne and Lorraine Kaczmarek and Ronald Pluth was the result of impermissibly suggestive procedures, and that because of such procedures they were denied due process of law. It is unnecessary to consider this contention inasmuch as we determine that the record in the instant case clearly establishes that the in-court identification by the three witnesses originated from a source independent of the photographic identification in question.

If pretrial identification procedures are conducted in a suggestive manner conducive to mistaken identification, the question of whether a defendant was denied due process in violation of his constitutional right depends upon the totality of the circumstances. However, where a witness had an adequate opportunity to observe, and there is little likelihood that the pretrial procedures led to a mistaken identification, a conviction based upon a subsequent in-court identification will not be set aside. *Simmons v. United States* (1968), 390 U.S. 377, 19 L.Ed.2d 1247, 88 S.Ct. 967; *People v. Black* (1972), 52 Ill.2d 544, 288 N.E.2d 376; *People v. Fox* (1971), 48 Ill.2d 239, 269 N.E.2d 720.

## II.

Defendants next contend that there was no independent basis for the in-court identification. Here, all three witnesses who made in-court identification of the defendants testified that the lighting conditions inside the tavern were such that each was able to see without any difficulty. Two of the witnesses estimated that the four offenders were in the tavern for approximately 10 minutes. Dianne Kaczmarek identified defendant Scott as the one who stood closest to her and her mother, and defendant Watson as the one who stood about 6½ feet away. She recalled observing defendant Watson frisk one of the patrons, and stated that it was defendant Scott who shot her mother. Lorraine Kaczmarek identified defendant Scott as the offender who stood about 5 feet from her, and defendant Watson as the one who had stood 10 to 15 feet away. She testified that she was face to face with defendant Scott during the robbery and that during that period she concentrated on the defendants' faces. She further testified that it was defendant Scott who had shot her in the hip. Ronald Pluth identified both defendants as members of the group which had robbed the tavern. He estimated that the closest he came to defendant Watson was 5 to 6 feet. He stated that he made his in-court identification of the defendants upon the basis of their facial features.

The record thus reveals the adequate lighting conditions inside the tavern, the close proximity of the offenders to the identifying witnesses, the substantial time in which the offenders remained inside the premises, and that they made no attempt to conceal their faces. These considerations well support the conclusion that the identifying witnesses had more than ample opportunity to observe the defendants. It is indeed unlikely that the photographic identification procedures used could have resulted in mistaken identification by the three witnesses. Moreover, the record affords no basis for such an assertion. All three witnesses testified that they never gave the police a description of any of the offenders and that the police in no way attempted to single out any individual's picture at the viewing of the photographs. Ronald Pluth testified that at the time he viewed the photographs the police did not inform him that the Kaczmareks had identified the defendants' pictures.

■■ The defendants argue that three factors of record evidence the highly suggestive nature of the photographic identification procedures used. *First,* that Dianne Kaczmarek viewed the photographs in her mother's presence shortly after her mother had seen them. *Second,* that Dianne Kaczmarek testified that some of the photographs were of older men when the only description the police had was that the offenders were young men. *Third,* that the State failed to comply with a court

order to produce the photographs exhibited to the witnesses. The first and second factors argued by defendants do not either singularly or collectively indicate any attempt by the police to influence the identification process. The third factor—the nonproduction at trial of the photographs—does not impart any implication that the procedures used were impermissibly suggestive. The record contains no explanation for the nonproduction. Further, upon failure to comply with the production order, the defendants' proper recourse would have been to object to any testimony concerning the photographic identifications until compliance was made or noncompliance sufficiently explained. The defendants failed to do this. We hold that the record adequately demonstrates that the in-court identifications of the defendants were of an independent origin and untainted by any improper photographic identification procedures.

## III.

■■ The defendants next contend that there was insufficient evidence to establish their guilt beyond a reasonable doubt in that the identification testimony at trial was weak, vague and uncertain and the result of improperly suggestive police procedures, while the defendants' alibi defenses remained unimpeached. As we have previously held, the in-court identifications of the defendants were of independent origin and therefore properly put before the jury. While the defendants correctly point out that only three of the nine occurrence witnesses presented by the State could identify the defendants, the testimony of only one witness, if positive and credible, is sufficient to convict, even though it is contradicted by the accused. (*People v. Novotny* (1968), 41 Ill.2d 401, 244 N.E.2d 182.) Although each defendant offered evidence in alibi which was not contradicted at trial, upon final analysis, the issue became one of the witnesses' credibility which was for the jury to decide. And where, as here, that determination was not so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of a defendant's guilt, the verdict will not be disturbed on appeal. *People v. Donald* (1963), 29 Ill. 2d 283, 194 N.E.2d 227.

## IV.

Defendant Watson next contends that the photographic identification of him by Ronald Pluth 3 to 4 weeks after the robbery, and after the defendant was available for a lineup identification, was improper because thereby a clearly inferior identification procedure was utilized when compared to the more reliable corporeal procedure in which the defendant would have been entitled to be represented by counsel. This contention is without merit. *First*, there is no evidence of record that at the time the photographs were exhibited to Ronald Pluth, defendant

Watson was in custody or otherwise available for a lineup. *Second,* even if the defendant was in custody at the time, the employment of photographic identification procedures for the identification of one already in custody is not improper. (*People v. Brown* (1972), 52 Ill.2d 94, 285 N.E. 2d 1.) *Third,* an accused who is already in custody is not entitled to have an attorney present at photographic identification exhibitions. (*People v. Holiday* (1970), 47 Ill.2d 300, 265 N.E.2d 634.) The defendant's citation of *United States v. Zeiler* (3rd Cir. 1970), 427 F.2d 1305, where it was held that one in custody is entitled to have counsel present at photographic identification sessions, is not persuasive nor controlling. The decision in that case is in direct conflict with the holding of the Illinois Supreme Court in the *Holiday* case which we follow.

## V.

■■ Defendant Watson further contends that the trial court erred in not limiting a jury instruction on circumstantial evidence to defendant Scott only. It is argued that the circumstantial evidence introduced at trial related only to defendant Scott, and that the trial court, in not limiting the instruction to defendant Scott alone, could have confused the jury and directed their attention away from the identification testimony which was the only evidence connecting Watson to the robbery. The instruction in question which was tendered by the State and given over defendant Watson's objection is IPI—Criminal No. 3.02B, and read as follows:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts, which tend to show the guilt or innocence of a defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict."

Conceding *arguendo* that the trial court erred in not limiting this instruction, we do not conclude that defendant was thereby so prejudiced in any manner as to affect the outcome of the trial. The giving of an instruction on circumstantial evidence is not reversible error where a defendant is proved guilty beyond a reasonable doubt, even though the record contains no circumstantial evidence. (*People v. Matthews* (1934), 359 Ill. 171, 194 N.E. 220; *People v. Fiereto* (1922), 303 Ill. 186, 135 N.E. 417.) In the instant case, defendant Watson was proved guilty beyond reasonable doubt by overwhelming evidence, and any error in not limiting the instruction was harmless error.

## VI.

■■ It is also contended by defendant Watson that certain portions of

the prosecutor's closing argument were designed solely to arouse the sympathy of the jury with respect to Ronald Pluth's injury, and resulted in prejudice to defendant. In his closing argument the assistant State's Attorney told the jury that the gratitude shown to Pluth for his help in opening the cash register was to have his rectum shot out, forcing him to endure 2 years of agony in and out of hospitals. Additionally, the jury was told that it was necessary to perform a colostomy to save Pluth's life. Again, we need not reach the merits of defendant's contention, for the record reveals that the defendant made no objection at trial to any of these statements. Failure to object to improper closing argument waives for purposes of appeal any error contained therein. *People v. Sinclair* (1963), 27 Ill.2d 505, 190 N.E.2d 298.

## VII.

Defendant Watson finally contends that it was improper for the trial court to convict and sentence him on six separate counts of attempted murder, armed robbery, and aggravated battery, in that all of the offenses arose out of the same transaction. Defendant Watson argues that since all the offenses occurred at the same time and place, and as the force employed in effecting the armed robbery was the same force which formed the basis of the other offenses, the defendant should have been convicted and sentenced for only one count of armed robbery. We have previously determined that this issue will also be considered as to defendant Scott.

Section 1—7(m) of the Criminal Code of 1961 provides that concurrent or consecutive sentences may be imposed where two or more offenses did not result from the same conduct. (Ill. Rev. Stat. 1969, ch. 38, par. 1—7(m).) "Conduct" is defined as an act or a series of acts and the accompanying mental state. (Ill. Rev. Stat. 1969, ch. 38, par. 2—4.) When different offenses are included in the same act, only one sentence may be imposed; however, such limitation does not apply where more than one offense arises from a series of closely related acts and the crimes are clearly distinct and require different elements of proof. *People v. Johnson* (1970), 44 Ill.2d 463, 475, 256 N.E.2d 343.

Defendants were convicted and sentenced on two separate counts of armed robbery, one of the bartender, Ronald Pluth, and one of the owner, Lorraine Kaczmarek. A person commits armed robbery when he takes property from the person or presence of another by the use of force or threatening the imminent use of force while armed with a dangerous weapon. (Ill. Rev. Stat. 1969, ch. 38, par. 18—2(a).) The ownership of the property taken is unimportant; its possession by the victim is adequate for the purpose of establishing the crime. (*People v. Steen-*

*bergen* (1964), 31 Ill.2d 615, 619, 203 N.E.2d 404; *People v. Skinner* (1968), 103 Ill.App.2d 201, 243 N.E.2d 509; *People v. Wooley* (1970), 127 Ill.App.2d 249, 262 N.E.2d 237.) Here, the property taken was limited to the money removed from the register. Both Ronald Pluth and Lorraine Kaczmarek were present in the tavern and were threatened with force and with a gun. The ownership of the money was in Lorraine Kaczmarek as owner of the tavern, and the care, custody and control was in Ronald Pluth as bartender. The facts clearly demonstrate each defendant's guilt as to both charges. Each defendant was convicted and sentenced on two separate charges of armed robbery for the single act or transaction. Two punishments cannot be imposed for a single act even though different ingredients are involved in the two cases. (*People v. Duszkewycz* (1963), 27 Ill.2d 257, 261, 189 N.E.2d 299.) Therefore, the convictions and sentences of each defendant as to the armed robbery of Ronald Pluth are reversed, and affirmed as to the armed robbery of Lorraine Kaczmarek.

■■■ We now further consider the argument that the convictions and sentences for all but the one armed robbery must be reversed. Each defendant was additionally convicted and sentenced on separate counts of attempted murder of Lorraine Kaczmarek and also of Ronald Pluth, for aggravated battery to Dale Mertes and for aggravated battery to Daniel Lapinski. Our statement in *People v. Ashford* (1974), 17 Ill.App.3d 592, 597, 308 N.E.2d 271, 275, is appropriate herein:

> "When different offenses are included in the same act, only one sentence may be imposed. The use of force or the threat of the imminent use of force is an essential element in the crimes of robbery and attempt robbery. (Ill. Rev. Stat. 1971, ch. 38, par. 18—1(a).) It is the element that differentiates robbery from theft. If a battery takes place in the course of a robbery the question arises whether this use of force was part of the robbery or separate from it. Often, the distinction is not easily made. If the battery immediately precedes the robbery it is normally held to be a component of the robbery (*e.g. People v. Randolph* (1972), 4 Ill.App. 3d 277, 280 N.E.2d 774); if it follows the robbery it is usually regarded as a separate offense, *e.g. People v. Baker* (1969), 114 Ill.App.2d 450, 252 N.E.2d 693."

Lorraine Kaczmarek was shot by defendant Scott while the offender with the shotgun began scooping the money out of the register. The shooting, which constituted the attempted murder on Lorraine Kaczmarek, was the use of force to effectuate the armed robbery. The two offenses were a part of the same transaction and inseparable. Neither was completed before the other. Accordingly, the conviction and sentence of each de-

fendant as to the attempted murder of Lorraine Kaczmarek must be vacated because it arose from the conduct comprising the offense of armed robbery. However, the armed robbery was completed when the offender with the shotgun had removed the contents from the cash register and Ronald Pluth had walked away. It was only thereafter that the offender with the shotgun shot Ronald Pluth and that the offenders shot Daniel Lapinski and Dale Mertes which are the acts constituting the new and distinct offenses of attempted murder and aggravated battery. These were distinct and separate acts from the already completed armed robbery. (*People v. Thompson* (1972), 3 Ill.App.3d 684, 278 N.E. 2d 1; *People v. Toliver* (1971), 133 Ill.App.2d 266, 273 N.E.2d 274.) Each was a separate offense against different victims. The trial court properly convicted defendants of the separate offenses of attempted murder of Ronald Pluth, aggravated battery of Daniel Lapinski and aggravated battery of Dale Mertes, and imposed separate sentences to be served concurrently.

■■ However, we notice that aggravated battery has been amended since the imposition of sentences herein and is now a Class 3 felony. (Ill. Rev. Stat. 1973, ch. 38, par. 12—4(d).) The Unified Code of Corrections provides that the minimum sentence for a Class 3 felony shall not be greater than one-third of the maximum term. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(c)(4).) Section 8—2—4 of said Code further provides that if prosecution has not reached a final adjudication the Code shall apply as to sentences if less than under the prior law upon which prosecution was commenced. (Ill. Rev. Stat. 1973, ch. 38, par. 1008— 2—4.) In the instant case, no final adjudication has been reached. (*People v. Reno* (1974), 17 Ill.App.3d 348, 308 N.E.2d 3.) We conclude that the two sentences imposed on defendant Scott for aggravated battery for terms of not less than 5 years nor more than 10 must be modified, and the two sentences are each modified by this court for terms of not less than 3 years and 4 months nor more than 10 years.

For the foregoing reasons, the judgments of conviction and sentence of both defendants for the armed robbery of Ronald Pluth and for the attempted murder of Lorraine Kaczmarek are reversed; the two sentences imposed on defendant Scott for aggravated battery are modified; as modified, the convictions and concurrent sentences as to each defendant for the armed robbery of Lorraine Kaczmarek, for the attempted murder of Ronald Pluth, and for the two aggravated batteries are affirmed.

Affirmed in part; reversed in part; modified in part.

McNAMARA, P. J., and DEMPSEY, J., concur.