THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIE HATCHER, Defendant-Appellant.

Fifth District   No. 75-148

Opinion filed February 2, 1977.

Stephen P. Hurley and Ann Hilbert Blandford, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert H. Rice, State's Attorney, of Belleville (Bruce D. Irish and James G. Condon, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE KARNS delivered the opinion of the court:

Defendant Willie Hatcher appeals from his conviction of armed robbery after a jury trial in the Circuit Court of St. Clair County. He

contends that pretrial identification procedures were so unnecessarily suggestive and conducive to mistaken identification as to deny him due process of law; that the trial court erred in allowing the admission of evidence of an offense other than the one for which he was being tried; and that he was not proved guilty beyond a reasonable doubt.

About 11:30 p.m. on June 8, 1974, the A & S Barbeque Stand in East St. Louis was held up by two men armed with small-caliber handguns. The robbers kicked in the rear door to the kitchen, received assurances that there was no gun on the premises, and ordered the four people present (the manager, his wife, and two other women) to get down on the floor. After a period of time estimated by the victims to be four to seven minutes, the robbers left with the women's purses, the manager's wallet, and the night's receipts from the cash register.

Twenty days later, on June 28 at about 4 p.m., the defendant and a female companion were arrested at a drive-up window of the First National Bank at East St. Louis after presenting for payment two checks on Mrs. Adams' account. The checks had been in Mrs. Adams' purse which was taken in the robbery.

The next day, June 29, at about 10 a.m., Detective Conrad Williams of the East St. Louis Police Department, who was investigating the armed robbery, telephoned Mrs. Adams and asked her to come down to the police station, purportedly to examine the signatures on the checks. About 11 a.m., when Mrs. Adams arrived along with her husband and Willa Tooks, another of the robbery victims, Detective Williams was seated at a desk taking a statement from the defendant. He had started taking the statement at 10:40 a.m., and concluded it at 11:55 a.m. According to Detective Williams, he immediately escorted the Adamses and Miss Tooks into another room, where Mrs. Adams informed him that the man at the desk was the one who had held a gun on her during the holdup.

At the hearing on defendant's motion to suppress identification, the defense called four witnesses, Mrs. Adams, Detective Williams, Willa Tooks, and the defendant. Because of certain conflicts in the testimony, it is necessary that we recite it at some length.

Mrs. Adams testified that she had been to the police station to look at photographs, along with her husband and Willa Tooks, about a week after the robbery. At that time she picked out the photograph of one man who looked "similar" to one of the robbers, but did not make any positive identification. She was called by police on June 29 to look at more photographs. She went with her husband and Miss Tooks to the station, where they were met by Detective Williams. They looked at a stack of about 40 photos for 20 minutes to half an hour. She picked out one photograph at that time. She testified that Detective Williams asked her if she had noticed the man sitting at the desk in the outer room on the way

in, but she had not paid any attention to him. On the way out, she noticed him, "but he made a point of hiding himself or hiding his face, and I really couldn't identify him, not at that time." She told Detective Williams that "I felt I could be sure one way or the other if I could see him in a lineup." The only identification she made that day was a photographic one. She did not look at any checks. Sometime late in September, about two weeks before the hearing on the motion to suppress, she was requested to attend a lineup "because, like at the police station, I felt that I could not make a positive identification of the man until I saw him in a lineup, and this was the purpose of it for me to really be sure." She "presumed" that the man she saw at the police station would be in the lineup, but she couldn't say that she "expected" to see him in the lineup. She "assumed" that one of the robbers would be in the lineup. She had known Willie Hatcher's name since the day he was arrested at the bank. She could not remember whether Detective Williams had informed her whose photograph she had selected on June 29. Detective Williams brought Mrs. Adams, her husband, and Miss Tooks to the St. Clair County Jail in Belleville for the lineup. She testified that the lineup was stopped (she was "pretty sure" it was after the third person) because the lights were not focused on the participants' faces. After Detective Williams adjusted the lights, the lineup began over from the beginning. At the conclusion of the lineup, Mrs. Adams asked that the men in the lineup turn around again as a group because she wanted to see their faces one more time. At this point she filled out a card identifying one of the men. She remembered commenting immediately afterwards that "you feed them well here, he's picked up a little weight." Detective Williams told her that the defendant had asked him if he had been picked. She could not remember whether the officer had told her that she had picked the defendant.

Detective Williams testified that his reports did not reflect any photographic identification procedures, either a week after the offense or on June 29. If any photographs had been shown, he would have made a record. He thought that there was a mug shot of Willie Hatcher on file at the East St. Louis Police Department. The witnesses were not shown any photos, because "we had been instructed when a person is incarcerated, you're not supposed to show their mug shots." When the witnesses arrived about 11 a.m., he took them to another room in the back of the detective section, because he did not want them to see the defendant. He did not recall asking Mrs. Adams whether she had noticed the defendant. According to his report, which he used to refresh his recollection, Mrs. Adams volunteered that the man he was talking to at the desk was the same man who had held a gun on her during the holdup. The witnesses were only at the station two or three minutes at the most. He did not remember telling Mrs. Adams what the defendant's name was, but he did

tell her there would be a lineup with "the subject" in it. The lineup was stopped after the number two man because the lighting was improper, and then started over from the beginning. The delay was approximately two to three minutes. He did not remember whether the defendant was the number two man in the lineup. He said that a record of the lineup should be in his report, but no such record was ever produced. The defendant was picked at the lineup. Williams did not remember asking Miss Tooks and Mr. Adams to accompany Mrs. Adams to the station on June 29, as they would have no reason to look at the checks, but he did not ask them why they were there when they arrived. It had not occurred to him that Mrs. Adams was likely to arrive while he was interviewing the defendant.

Miss Tooks testified that she was twice requested to come down to the police station to look at photographs, and that Detective Williams was there on both occasions. He did not tell her that a suspect was in custody, nor did she hear him tell anyone else. Although she was present when Mrs. Adams picked out a photograph at the second viewing, she herself made no photographic identification. Both she and Mr. Adams looked at the photo that Mrs. Adams selected. She remembered telling Mrs. Adams that she was "pretty sure it was him." She did not hear Mrs. Adams identify the man at the desk as one of the robbers, though she did hear Mrs. Adams tell Detective Williams that "she couldn't be sure of the fella until she saw him in a lineup." She did not remember at what point the lineup was stopped. She remembered telling Mrs. Adams afterwards that she was "pretty sure" of the man she selected; she recognized him as the same man whose photograph Mrs. Adams had selected on June 29, although "he's different now, he's picked up a little weight and he has a mustache and he was clean shaved at the time that I saw him." Over objection, she was permitted to testify that her identification at the lineup had not been influenced by seeing the photograph.

Defendant Willie Hatcher testified that he saw the Adamses and Miss Tooks with Detective Williams on June 29. They passed by him on the way in and on the way out of the station. After the witnesses left, the detective "came back and told me, say * * * well, he hadn't told me right then I was involved in a armed robbery. He came back and said, to tell you the truth, this whole thing leads back to an armed robbery and these people right here just picked you out." He was the number two man in the lineup: "the moment they told me to turn around, step forward and face the front, they stopped the lineup there." When the lineup started over, he was required to step forward a second time.

The court then stated that it was granting the motion to suppress because of the "classic one on one identification" by Mrs. Adams at the police station. On the basis of Miss Tooks' testimony that she had made no

identification at the station, her lineup identification was not suppressed.

At this point in the proceedings, defense counsel moved to dismiss the case for suppression by the police department of evidence favorable to the defendant, specifically, the failure of the police to supply to the defendant any information about the photographic identification procedures. "That would be critical information at a trial, whether or not the photograph identified was the defendant or not, and also who was identified the first time [the picture that Mrs. Adams said looked similar to one of the robbers], and also whether the photograph of the defendant was shown the first time and not identified." The assistant state's attorney stated in response to the motion that he had talked with Detective Williams, who was to bring the complete file on the case to court later that day. The court held that it was not in a position to rule as to whether or not there had been intentional suppression until the detective arrived with the file, but indicated that the State would simply "have to live with" whatever inferences favorable to the defendant the jury might draw from the conflicting testimony of Detective Williams and the other witnesses and the non-production of the photographs.

After a discussion off the record, Mrs. Adams was recalled by the State to testify as to the circumstances surrounding the armed robbery. She testified that the first of the robbers, "who was I know now Mr. Hatcher," entered with a gun in his right hand, came directly to her husband and told him "this is a holdup," and ordered everybody to get on the floor. She was about 10 feet from this man when he entered the back door of the barbecue stand. She said that the light in the room was good, perhaps not as bright as the courtroom, but adequate. She said there were about three hanging bulbs in a room whose dimensions were about 15 by 14 feet. It was possible to read by the light in the room. When her husband got down on the floor, she "got across him, on top of him, because of the way the man was holding the gun down on him. I felt he was going to shoot him in the head." She testified further:

"* * * [H]e came and stood with the gun on us and then he moved back and picked up the purse. I had a purse under the table. Mrs. Smith's purse was under the serving table and he picked up both of those purses, and he looked directly at me, and me at him, and I said please take the money out of the purses and throw them out in the street. And he said, yes, ma'am, and he stood there holding the gun on us and I just looked at him until the other man at the cash register emptied the cash register."

She estimated that the robbers were in the stand from five to seven minutes. She gave the following description, she said, to the investigating officers:

"I told them he was wearing one of the hats that many of the

young men wear now that looks something like a fishing hat, and multicolored. And he's kind of thin, not heavy, but not thin, you know. Well, let me see * * * well, he's thin, like your size [referring to the public defender], thin features. And I told him what he was wearing, a T-shirt and sport pants. And he is dark in coloring, darker than I am. Very smooth skin. Clean cut. He had a natural, well kept. No identifying features on his face, like scars or anything. And very bright, clear eyes, and perfectly lined teeth, very white teeth. And very mannerable, for a burglar, you know. * * * And I can remember his height, he is about my height, possibly a little bit taller.

Q. How tall are you?

A. Five four."

Later, she said that the robber might have been between five feet seven and five feet eight inches tall. She testified that "[h]is face is very distinctive to me, because if I close my eyes I can see it, I can remember him." Her conversation with the robber occurred while she was kneeling down on the floor to cover her husband. After Mrs. Adams repeated her estimate that the robbery took from five to seven minutes, defense counsel conducted an experiment in the course of which Mrs. Adams estimated that two minutes had elapsed after only 35 seconds. She said that the description she gave was the same one she gave to police on the day of the offense, and was not influenced by her later viewings of the defendant. She testified that the investigating officers took notes while she gave her description.

After arguments of counsel, the court held that it was going to allow Mrs. Adams to identify the defendant at trial as one of the robbers, based on its finding that there was a sufficient independent basis for the identification. Although noting that "the conduct or integrity of the East St. Louis Police Department leaves a lot to be desired as far as this case is concerned," the court denied the defendant's motion to dismiss, holding that the discrepancy between the witnesses' stories and that of the police "goes to the weight, not the admissibility."

Immediately after this ruling, the case went to trial. The State called six witnesses: the four employees of the barbecue stand, the cashier at the bank where the defendant attempted to cash the checks, and the police officer who made the arrest at the bank. Mrs. Emma Smith, who was working in the kitchen of the barbecue at the time of the robbery, testified that she stayed down on the floor during the robbery and did not try to look at or talk to the robbers. She was scared, and was unable to give any description. She estimated that the robbery took five to seven minutes. In an experiment conducted by defense counsel, she estimated that two minutes had elapsed after 28 seconds. She then conceded that the

robbery could have taken place in quite a bit less than five minutes: "Something happens like that you're scared to death, you can't estimate just how long it takes them. It takes a good person to do that. But I know it was quick, they didn't tarry."

Leon Adams, the manager of the barbecue stand, testified that he saw the first robber come in with a gun and immediately obeyed the order to get down on the floor. His wife got down on her knees and leaned on him, with her hand on his head. He saw only one gun. He had no conversation with the robbers, and did not get a good look at them. He only saw them for two or three seconds as they came through the door. His wallet was taken from his back pocket. He was unable to give any description to the investigating officers. He remembered that the first robber had on a hat. He estimated that the whole incident lasted four or five minutes. He said that the room had four 75-watt light bulbs hanging from the eight-foot ceiling. He viewed photographs and attended a lineup, but was unable to make any identification.

Mrs. Adams testified that she was a school teacher, but was working with her husband the night of the robbery at the barbecue stand. She identified People's Exhibit No. 2 as her checkbook which had been in the purse taken in the robbery. She identified People's Exhibit No. 1 as three checks from the checkbook, which had been made out and signed by someone other than herself. During the robbery she primarily watched the first man who entered, with whom she talked, and never got a very clear look at the other robber. She indicated that she was referring to the defendant when she spoke of the first man to enter, but did not identify him by name. She estimated that the robbers were in the place for five to seven minutes. She said she talked to both of the investigating officers. She learned the defendant's name from a police officer who called to tell her that he had been arrested at the bank.

Miss Tooks testified that she had been helping out Mr. Adams by waiting on customers at the barbecue stand the night of the robbery. She was standing right by the back door when the robbers entered, and got a look at both of them. Both were carrying guns. She lay down immediately when ordered to do so, and had no conversation with either of the men. She had waited on one of the men, who had entered and ordered a sandwich half an hour or less before the robbery. She testified that she had identified the defendant as one of the robbers at a lineup. She estimated that the robbery took five minutes or a little longer. Although she saw the robber whom she identified as the defendant as he entered, she looked primarily at the other man. She spoke with one of the investigating officers, a woman. She told the officer that the robber whom she later identified as the defendant was about the size of the male

investigating officer and had on a hat; the other robber had a goatee; their skin was very smooth, without any blemishes. She viewed photographs at the police station on two occasions. The first time, she did not identify anyone. Then, contrary to her testimony at the hearing on the motion to suppress, when asked whether she was able to make any mug shot identification on the second viewing, she answered:

"A. Yes, uh-huh.

Q. You did make a mug shot identification?

A. Yes.

Q. Were there any officers present with you at that time?

A. Yes.

Q. Who were the officers?

A. I don't know.

Q. You don't know who the officer was with you?

A. Well, there was several policemens around us at the time.

Q. Did you tell any of the police officers that you had selected a mug shot?

A. Mrs. Adams told them.

Q. Well, I mean, did you personally tell them?

A. No, I didn't say anything, no. * * *"

She was positive that Mr. Hatcher was one of the men who robbed the barbecue stand. On cross-examination, also contrary to her testimony at the hearing, she testified that she had seen the defendant at the police station (on June 29) and recognized him as one of the robbers, but did not inform anyone. Questioned about her testimony at the hearing, she said she thought the question then referred to photographic identification, and continued:

"A. I didn't know you meant the man in the room. I really didn't pay him any attention. I just glanced at him.

Q. You didn't pay him any attention, but now you say that you recognized him?

A. Well, you walk in a room and you glance at a person, and you just see his face, and you just keep going.

Q. And you saw this man there at that time?

A. Yes.

* * *

Q. Did you tell Officer Williams that you had recognized the man?

A. No.

* * *

Q. * * * Didn't you think that was important? If you saw the man to tell Officer Williams?

A. I figured if he would let me see mug shots, it would have to be there somewhere, and if it hadn't have been, I would have said something.

\* \* \*

Q. So, you weren't going to announce that you saw the man until somebody asked you if you saw him?

A. Right.

Q. Did you tell anybody else that you had seen this man?

A. No, I didn't say anything."

A discussion was then held out of the presence of the jury. The court agreed with defense counsel that it was the fact that Miss Tooks did not identify the defendant at the police station which had been the basis for not suppressing her lineup and in-court identifications of the defendant. Defense counsel requested dismissal of the case. The court suggested the possibility of declaring a mistrial, which, after a discussion with the defendant, defense counsel declined to request. At this point the prosecution asked for an opportunity to recall Mrs. Adams to make an in-court identification of the defendant, having misunderstood the previous rulings of the court to mean that such an identification would not be allowed. Over objection, the court gave permission to recall Mrs. Adams.

When court reconvened the next day, Miss Tooks attempted to clarify her testimony. She denied that she had testified the previous day that she had recognized the defendant at the police station as one of the robbers.

"A. \* \* \* [M]aybe you misunderstood what I was saying.

Q. Maybe I did.

A. Now, when I walked into the room, I saw the man and I glanced at him and he hid his face and I just kept going. But to have said, yes, this was the man that robbed me, I wouldn't have said it, cause I didn't see his face cause it was more of a side glance, he looked at me.

Q. Are you saying it now, that you recognized him then?

A. To have said that he was the man that robbed me, no. But I know he was the man in the room now I'm looking at him.

\* \* \*

Q. But now that you see a defendant sitting beside me in the courtroom, you're sure that that was the man who was in the Detective Bureau?

A. No, when I saw him in the lineup. . . Oh, that he was in the detective room, yes. But to know that he was the robber when I saw him in the lineup.

Q. Go on.

A. And that's when I recognized, really remembered his face.

\* \* \*

* * *

Q. * * * [I]s it fair to say, Miss Tooks, it's only now and not in the detective room that you've come to the conclusion that Willie Hatcher was the man sitting there and that he was an armed robber?

A. Maybe it's not fair, but that's the way I have to say it."

On redirect examination, Miss Tooks testified that the photograph she had identified was one of the defendant. She was then asked whether anyone else had identified that picture, and answered affirmatively.

Mrs. Adams was then recalled to the stand by the State. She testified as to the description she gave to the investigating officers, which was substantially the same as that she recounted at the previous hearing. She then identified the defendant as one of the robbers.

Out of the hearing of the jury, the court sustained a defense objection to the introduction of any evidence concerning one of Mrs. Adams' checks that was cashed the day prior to the defendant's arrest. However, when Robert Kassing, the cashier at the First National Bank at East St. Louis, took the stand, he twice mentioned making restitution to Mrs. Adams for a forgery before defendant's arrest. He testified that he was at the drive-in window at the time a man and a woman presented Mrs. Adams' checks for payment. He knew that neither of them was Mrs. Adams. He identified People's Exhibit No. 1 as the checks that were presented.

Patrolman Rodell Andrews of the East St. Louis Police Department identified Willie Hatcher as one of the two people he arrested at the First National Bank on June 28. He identified two of the checks in People's Exhibit No. 1 as those handed to him by Mr. Kassing at the bank. The other, he testified, he found on the front seat of the car, along with People's Exhibit No. 2, Mrs. Adams' checkbook, which he also identified. He did not know who had been driving the car, nor who owned it. He did not find anything belonging to Emma Smith, Leon Adams, or Willa Tooks. The State then rested its case, and the defense moved for a directed verdict, which was denied.

The defense then called its first witness, Detective Conrad Williams. He testified that Willa Tooks never told him that she recognized anyone at the police station, nor that she had made any photographic identification. The following exchange then occurred:

"Q. Did you make any recording of any photographic identification?

A. I made a recording of Miss [sic] Doris Adams.

Q. Of a photo * * * Now, just a minute, Officer, of a photographic identification.

A. Not of a photographic identification."

Asked what time Mrs. Adams arrived at the station, Williams responded:

"My report of Mrs. Adams telling me that the defendant was the stickup man was made at eleven o'clock A.M., the 29th."

The defense next called Officer Delores Gathing, one of the two investigating officers. She testified that she took a description from Miss Tooks, wrote it down, and filed it in the normal course of her duties. Using a copy of her report to refresh her recollection, she testified that Miss Tooks' description, *in toto*, was "[t]hat the subject number one was six-one with a beard, and the second subject was six-one, slender, with a cloth cap on." If any further description of facial features or color or anything of that nature had been given, she would have taken it down.

The other investigating officer, Patrolman John Thurman, testified that to the best of his knowledge all the information that was transmitted to him regarding the armed robbery was put into his report. He said that he spoke with all four victims. The descriptions of the robbers included in the offense report naming Leon Adams as the victim were actually collective descriptions, incorporating all the information he was given by all the victims. None of the victims described either of the robbers as having very smooth skin, a well-kept natural, clear and very bright eyes, and even teeth. He was given a description of two Negro males, both about his own size (six feet one inch tall and slender). One of the robbers was wearing a hat with a band around it. One was wearing some kind of jersey. There was no description of either of the robbers' faces, although there was mention that the one not wearing the hat had a beard and a natural hair style. If he had been given a more detailed description, he would have written it down in the normal course of filling out his report.

A defense motion for a directed verdict at the close of all the evidence was denied. In its closing argument, the State emphasized the positive in-court identifications of the defendant by Mrs. Adams and Miss Tooks, and the fact that defendant had been arrested in possession of the fruits of the crime. The defense argued that the stationhouse confrontation had a suggestive effect on the later identifications; that the failure of the police to produce the photographs indicated that in fact a picture of someone other than the defendant had been chosen; that the witnesses had only a short time to observe the robbers; and that the descriptions taken down by the investigative officers "could fit ten thousand black people in East St. Louis," while Mrs. Adams' lengthy, detailed description in court was actually of the man seated at the counsel table, not of the armed robber. The jury found the defendant guilty of armed robbery. Defendant's post-trial motion was denied after a hearing, and he was sentenced to four to six years in the penitentiary. This appeal followed.

This case poses questions concerning pretrial identification procedures similar to those dealt with by the United States Supreme Court in the *Wade-Gilbert-Stovall* trilogy (*United States v. Wade*, 388 U.S. 218, 18 L.

Ed. 2d 1149, 87 S. Ct. 1926 (1967); *Gilbert v. California*, 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (1967); *Stovall v. Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967)). In *Wade*, Mr. Justice Brennan stated the reason for the concern about pretrial identifications:

> "* * * [T]he confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. * * *' A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. * * * Suggestion can be created intentionally or unintentionally in many subtle ways. And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest.

> "Moreover, '[i]t is a matter of common experience that, once a witness has picked out the accused * * *, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' " 388 U.S. at 228-29, 87 S. Ct. at 1933, 18 L. Ed. 2d at 1159 (citations omitted).

In *Wade* and *Gilbert*, the Court held that a defendant has a constitutional right to the aid of counsel at a post-indictment lineup; that testimony as to any identification made at such an illegal pretrial proceeding is *per se* inadmissible; and that, before an in-court identification is made, the burden is on the State to establish that it was not tainted by an illegal proceeding, but is of an independent origin. In *Stovall*, the Court made it clear that even when *Wade* and *Gilbert* are inapplicable, a defendant may attack his conviction on the ground that, under the totality of the circumstances, "the confrontation conducted * * * was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." 388 U.S. 293, 301-02, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972.

Numerous State and Federal cases have refined the principles outlined in *Wade-Gilbert-Stovall*. The leading Illinois case involving a "showup," in which a lone suspect is shown to a witness for identification (as

occurred in the instant case at the police station), is *People v. Blumenshine*, 42 Ill. 2d 508, 250 N.E.2d 152 (1969). Such a procedure, our supreme court observed, carries with it "a dangerous degree of improper suggestion." (42 Ill. 2d 508, 512, 250 N.E.2d 152, 154.) In effect, such a showup may say to the witness "This is the man." See *Foster v. California*, 394 U.S. 440, 443, 89 S. Ct. 1127, 1129, 22 L. Ed. 2d 402, 407 (1969).

The court in *Blumenshine* pointed out that there are justifying or saving circumstances under which a showup will not be considered a denial of ' due process, citing *Stovall* itself, where the hospital viewing, necessarily suggestive, was imperative because it was uncertain that the victim would survive; *People v. Speck*, 41 Ill. 2d 177, 242 N.E.2d 208 (1968), where the identifying witness had an excellent opportunity to observe the crimes; *People v. Robinson*, 42 Ill. 2d 371, 247 N.E.2d 898 (1969), where the witness knew the person identified before the crime; and *People v. Bey*, 42 Ill. 2d 139, 246 N.E.2d 287 (1969), where uncommon distinguishing characteristics were the principal means of identification. Later cases have suggested that inadvertent, unforeseeable encounters should be added to the list. (See, *e.g., People v. Fultz*, 32 Ill. App. 3d 317, 336 N.E.2d 288 (1st Dist. 1975).

■■ Once the impropriety of an identification procedure has been shown, the State must prove by clear and convincing evidence that each witness' identification of the defendant had an independent origin and was not influenced by the unnecessarily suggestive procedure. (*People v. Blumenshine*.) Some of the factors to be considered by the court are the length and the quality of the witness' opportunity to observe at the time of the crime; his degree of attention to the criminal; discrepancies or correspondences between any description given before the suggestive procedure and ' the defendant's actual description; any previous identification of another person; any prior identification of the defendant's photograph; the level of certainty demonstrated by the witness at the confrontation; and the lapse of time between the crime and the identification. (*Wade; Blumenshine; Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972).) If any witness' identification is not shown to be of an independent origin, the defendant is entitled to a new trial free of the tainted testimony, unless that witness' testimony was harmless error beyond a reasonable doubt. *Blumenshine*.

■■ As each such case must be viewed in light of all its facts, the disposition of *Stovall*-type due process claims by the reviewing courts has necessarily been quite varied. If the court cannot make an informed judgment from the record whether or not the procedures used were impermissibly suggestive and conducive to mistaken identification, or whether the identification had an independent origin, the judgment of conviction will be vacated and the case remanded to the trial court for a

hearing into the circumstances bearing on admissibility. (*Gilbert v. California; People v. Blumenshine; People v. Holiday*, 47 Ill. 2d 300, 265 N.E.2d 634 (1970).) Justice may be better served in other cases by reversal and remand for a complete new trial. (*People v. Robinson*, 46 Ill. 2d 229, 263 N.E.2d 57 (1970).) Where there is *no* identification testimony upon which a conviction could be based, a case will be reversed outright. (*People v. Sanders*, 4 Ill. App. 3d 494, 280 N.E.2d 269 (5th Dist. 1972); *People v. Magadanz*, 126 Ill. App. 2d 335, 261 N.E.2d 703 (1st Dist. 1970).) In some cases the introduction of identification evidence will be seen to have such a prejudicial effect on the defendant's right to a fair trial that the case must be reversed and remanded under Supreme Court Rule 615(a) (Ill. Rev. Stat. 1975, ch. 110A, par. 615(a)), despite defense counsel's consent to the introduction of the evidence and failure to raise the issue in his motion for a new trial. *People v. Clark*, 12 Ill. App. 3d 280, 297 N.E.2d 395 (3d Dist. 1973).

■■ It has long been the law in this State, of course, that a conviction will not be permitted to stand where it rests upon an identification which is doubtful, vague, and uncertain, and which does not produce an abiding conviction of guilt; proof beyond a reasonable doubt that the accused was the perpetrator of the crime is part of the prosecution's burden. (See *People v. Gardner*, 35 Ill. 2d 564, 221 N.E.2d 232 (1966); *People v. McGee*, 21 Ill. 2d 440, 173 N.E.2d 434 (1961).) On the other hand, precise accuracy in describing physical characteristics is not required unless a reasonable doubt is raised as to the identity of the perpetrator. (*People v. Catlett*, 48 Ill. 2d 56, 268 N.E.2d 378 (1971); *People v. Ragan*, 33 Ill. App. 3d 151, 337 N.E.2d 432 (1st Dist. 1975); *People v. Nichols*, 32 Ill. App. 3d 265, 336 N.E.2d 194 (1st Dist. 1975); *cf. People v. Harrison*, 25 Ill. 2d 407, 185 N.E.2d 244 (1962); *People v. Sanders*, 4 Ill. App. 3d 494, 280 N.E.2d 269 (5th Dist. 1972).) Positive identification by one witness who had a good opportunity to observe the accused is sufficient to sustain a verdict of guilty. (*People v. Irons*, 20 Ill. App. 3d 125, 312 N.E.2d 664 (5th Dist. 1974); *People v. Sanders*, 5 Ill. App. 3d 89, 282 N.E.2d 742 (1st Dist. 1972).) The ultimate question is whether the in-court identification is reliably predicated upon an observation independent of the challenged in-custody confrontation. *People v. Triplett*, 46 Ill. 2d 109, 263 N.E.2d 24 (1970).

We must now proceed to apply these principles established by the case law to the facts of the case at bar. In so doing, we conclude that the case must be remanded for a new trial.

■■ There can be no doubt, we think, that the trial court properly excluded testimony based on the one-on-one confrontation at the police station. As in *People v. Sanders*, 4 Ill. App. 3d 494, 280 N.E.2d 269 (5th Dist. 1972), we can find no justification for the viewing as it was

performed. The officer's testimony that it had not occurred to him that the witnesses were likely to arrive while he was interviewing the defendant is entitled to little weight. The instant case is unlike *People v. Brown*, 32 Ill. App. 3d 182, 336 N.E.2d 523 (1st Dist. 1975), cited by the State, where there was a "coincidental confrontation" which was neither planned nor suggested. (*Cf. People v. Fultz*, 32 Ill. App. 3d 317, 340, 336 N.E.2d 288, 306 (1st Dist. 1975) ("a chance encounter which the police not only did not arrange but could not reasonably have foreseen so as to prevent it"); *People v. Pardue*, 6 Ill. App. 3d 430, 286 N.E.2d 29 (1st Dist. 1972).) Here, the officer called the victims to the station and then proceeded to conduct an interview at a time and in a place where he should have known that the victims would see the accused upon their arrival. With identification testimony arising out of that original confrontation excluded, the question then becomes whether the subsequent identifications by Mrs. Adams and Miss Tooks were free from its influence and based solely on their observations at the time of the robbery. (See *People v. Robinson*, 46 Ill. 2d 229, 263 N.E.2d 57 (1970); *People v. Seets*, 37 Ill. App. 3d 369, 346 N.E.2d 61 (4th Dist. 1976).

■■ As for the alleged photographic identification, or identifications, we start from the premise that a conviction based on such identifications will be set aside only if the procedures used were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*Simmons v. United States*, 390 U.S. 377, 19 L. Ed. 2d 1247, 8 S. Ct. 967 (1968).) Our supreme court has expressed its disapproval of the use of photographs when a suspect is in custody and a lineup is feasible (*People v. Holiday*, 47 Ill. 2d 300, 265 N.E.2d 634 (1970)), a stricture of which Detective Williams was apparently aware.[1] In this case, we are faced with a remarkable situation in that the State put on witnesses to alleged photographic identification procedures which the police deny ever occurred. Neither the photographs themselves nor a record of the procedure was ever produced. We must agree with the court in *People v. Jackson*, 12 Ill. App. 3d 789, 299 N.E.2d 142 (1st Dist. 1973), that in such circumstances the defendant's burden of proving suggestiveness becomes a heavy one indeed. *Cf. People v. Moore*, 12 Ill. App. 3d 78, 298 N.E.2d 202 (1st Dist. 1973); *People v. Scott*, 23 Ill. App. 3d 956, 320 N.E.2d 360 (1st Dist. 1974).

■■ In addition, we have the unusual circumstance here that Mrs. Adams *never testified, either at the hearing or at the trial, that the picture she selected was one of the defendant.* She could not remember whether Detective Williams told her whose photograph she had picked. Miss

---

[1] He testified at the hearing that "we had been instructed when a person is incarcerated, you're not supposed to show their mug shots."

Tooks' testimony at the hearing was that she was present when Mrs. Adams made her selection, but that she had made no such identification herself. At trial, Miss Tooks changed her story and said that she *had* picked a photograph, and that it was one of the defendant. The prosecutor then asked Miss Tooks whether anyone else had picked a photograph of the defendant. Defense counsel, who had moved for dismissal of the case upon Miss Tooks' previous change in her testimony (when she said that she *had* seen the defendant at the station), did not object to this question or move to strike the affirmative answer. The question, of course, sought to elicit inadmissible hearsay, and may well have been designed to give the jury the erroneous impression that Mrs. Adams had testified that she identified a picture of the defendant. (See *People v. Ford*, 21 Ill. App. 3d 242, 315 N.E.2d 87 (1st Dist. 1974); *People v. Harrison*, 25 Ill. 2d 407, 185 N.E.2d 244 (1962).) In light of the prosecutor's improper question to Miss Tooks, we cannot assume that the failure to ask Mrs. Adams if the photograph she picked was that of defendant was a mere oversight. Under all these circumstances, given the denial of the police that any photographic identification took place, the fact that the defendant was in custody, the inconsistencies in Miss Tooks' testimony, the nonproduction of the photographs and the absence of testimony by Mrs. Adams that she picked defendant's photograph, we cannot see how the testimony concerning the viewing of photographs had any probative value.

■■■ It is somewhat unclear from the record whether the trial court intended, in granting defendant's motion to suppress, to exclude testimony as to Mrs. Adams' lineup identification. Apparently the State so understood the court's ruling, as no such evidence was introduced at the trial; on appeal, however, the State contends that the lineup identification was not suppressed. After Miss Tooks' surprise testimony at trial that she had recognized the defendant at the police station on June 29 as one of the robbers, the court indicated that her lineup identification would have been suppressed had she so testified at the previous hearing. In any event, we think that the State failed to show by clear and convincing evidence that the lineup identifications were untainted by the improper viewing at the police station. Mrs. Adams' feeling that she could not make a positive identification of the man she saw at the station until she saw him in a lineup, the officer's statement that "the subject" would be in the lineup, and Miss Tooks' recognition of the man in the lineup as the same one whose photograph Mrs. Adams had selected, all indicate that both lineup identifications were dependent on and influenced by the earlier, inadmissible procedures. Miss Tooks' subjective impression that her lineup identification was not influenced by seeing the photograph that

Mrs. Adams had selected was irrelevant and entitled to no weight. As the court said in *People v. Franklin*, 22 Ill. App. 3d 775, 785, 317 N.E.2d 611, 618 (1st Dist. 1974):

> "To determine the constitutionality of a lineup on the basis of a witness' assurance that he was not influenced by some otherwise suggestive procedure is to allow each witness to become his own judge of the accuracy of his identification. This procedure is not contemplated in the *Wade-Gilbert-Stovall* decisions and further ignores certain problems inherent in the identification process itself."

■■ Nor do we think that Miss Tooks' in-court identification was properly allowed. Only by distorting the meaning of the word could her identification of the defendant be described as "positive." Her testimony at the hearing and at trial was hopelessly contradictory, as everyone involved was aware. Although we are in full agreement with the trial court that defense counsel's refusal to seek a mistrial on the basis of her change in testimony at trial was an attempt to "have his cake and eat it too," it appears equally clear that Miss Tooks' surprise testimony deprived the defendant of substantial rights, and we will thus take note of this error under Supreme Court Rule 615(a) (Ill. Rev. Stat. 1975, ch. 110A, par. 615(a)). A further hearing to determine whether there was an independent basis for an in-court identification by Miss Tooks will be required upon remand.

■■ On the other hand, we do not think that the trial court erred in finding a sufficiently independent and uninfluenced source to stand as the basis for Mrs. Adams' in-court identification. She had an opportunity to observe the robber face-to-face from a short distance in the well-lighted barbecue stand while she had her conversation with him about the purses. (See *People v. Irons; People v. Sanders*, 5 Ill. App. 3d 89, 282 N.E.2d 742 (1st Dist. 1972).) Conflicts in the evidence as to whether or not she gave a description matching that of the defendant shortly after the crime are properly for a jury to resolve.

Although, as we have noted, a positive identification by one witness who had a good opportunity to observe may be sufficient to sustain a guilty verdict (*People v. Irons*), we think justice demands that this case be reversed and remanded for a new trial free of the cumulative prejudicial effect of the errors noted above. We are unable to declare that Detective Williams' unsolicited testimony that Mrs. Adams had identified the defendant at the stationhouse confrontation as the "stickup man"; Miss Tooks' testimony that Mrs. Adams had identified a picture of the defendant; the testimony as to the tainted lineup identifications; and Miss Tooks' in-court identification were harmless beyond a reasonable doubt. There is a reasonable possibility that this evidence might have

contributed to the conviction. (See *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967).) At a new trial, the jury will be better able to weigh the legitimate evidence related to the identification of the defendant as one of the perpetrators of the armed robbery.

■■■ We find no merit in the other issues raised by the defendant. Evidence that defendant was in possession of the fruits of the robbery at the drive-in window of the bank was relevant; absent other facts and circumstances which would leave in the mind of the jury a reasonable doubt as to guilt, such unexplained possession of the fruits of a crime may raise an inference of guilt. (*People v. Reynolds*, 27 Ill. 2d 523, 190 N.E.2d 301 (1963); *People v. Ward*, 31 Ill. App. 3d 1022, 335 N.E.2d 57 (2d Dist. 1975); *People v. Umphers*, 133 Ill. App. 2d 853, 272 N.E.2d 278 (5th Dist. 1971).) Evidence which tends to prove a fact in issue is admissible even though it discloses that the defendant committed another crime. (*People v. McDonald*, 62 Ill. 2d 448, 343 N.E.2d 489 (1975); *People v. Dewey*, 42 Ill. 2d 148, 246 N.E.2d 232 (1969); *People v. Ward*, 37 Ill. App. 3d 960, 347 N.E.2d 381 (1st Dist. 1976).) Although the testimony about the forgery which occurred the day before the defendant's arrest was arguably irrelevant, in that defendant was not linked to that occurrence, it did explain the cashier's reason for detaining the defendant at the bank. If error, we think it was harmless.

For the foregoing reasons, the judgment of conviction is reversed and the case is remanded to the Circuit Court of St. Clair County for a hearing as to the independent basis for Miss Tooks' in-court identification and a new trial consistent with the views expressed in this opinion.

Reversed and remanded, with directions.

JONES and G. J. MORAN, JJ., concur.