THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN McTUSH *et al.*, Defendants-Appellants.

First District (5th Division)  No. 78-725

Opinion filed October 26, 1979.

Peter C. Rolewicz, of Chicago, for appellant Lonzell Stone.

Ralph Ruebner and Gary Jay Ravitz, both of State Appellate Defender's Office, of Chicago, for appellant John McTush.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Paul C. Gridelli, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court: ·
Defendants John McTush and Lonzell Stone were jointly indicted for the murders and armed robberies of two men and for burglary. McTush was tried before a jury and was found guilty of murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1), armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), and burglary (Ill. Rev. Stat. 1975, ch. 38, par. 19—1). Stone was simultaneously tried without a jury in a bench trial and was found guilty "in manner and form as charged in the indictment." Following a hearing in aggravation and mitigation, McTush was sentenced to a term of from 60 to 90 years imprisonment and Stone was sentenced to a term of from 25 to 50 years imprisonment. Both defendants appeal.

We note at the outset that the evidence adduced at the trials differ as to each defendant. It is therefore necessary that we recite the testimony at some length. For purposes of clarity, we will first present the pertinent evidence adduced at the suppression hearing and jury trial of McTush.

Prior to trial, McTush moved to suppress evidence of a photographic identification of him and any resultant in-court identification. Stone did not join in this motion. At the suppression hearing the following pertinent evidence was adduced.

*For the defendant*
*John Ridges, Chicago Police Officer*
On February 21, 1976, he was assigned to investigate a double homicide which occurred the day before at the Kar-Life Battery Shop at 6959 South Ashland in Chicago. In the course of his investigation a lineup was held on March 18, 1976. The lineup consisted of five men and included McTush. Terrence Watson, an 11-year-old boy, and Ira Watson, his mother, separately viewed the lineup through a one-way mirror. Neither the boy nor his mother were able to identify any member of the lineup as a participant in the double homicide of February 20.

On May 24, 1976, he was present when Mrs. Watson and her son were interviewed by an assistant State's Attorney. While his mother waited in another room Terrence was shown a photograph of a lineup conducted on February 21, 1976. Terrence identified Stone from the photograph. Terrence was then shown photographs of six individuals from which he identified McTush and stated that he had previously seen McTush at the lineup on March 18. Mrs. Watson was then shown these photographs. She identified Stone as "having all the physical characteristics and similarities" of the man she saw at the battery shop on February 20.

On cross-examination, Ridges testified that Terrence told him he previously did not identify Stone or McTush because he was afraid of what might happen to him and his family. Ridges noticed at the March 18, 1976, lineup that Terrence Watson appeared very upset and nervous. He further testified that sometime after May 24, Terrence Watson told him he knew McTush from his neighborhood prior to February 20, 1976.

At the conclusion of Ridge's testimony, the trial court found the photographic identifications of May 24 to be impermissibly suggestive and required counsel for McTush to elicit evidence of independent origin. Counsel for McTush called Terrence Watson to the stand.

*Terrence Watson*
On the evening of February 20, 1976, he was playing on the street outside of the Kar-Life Battery Shop. When he looked through the window of the shop, he saw David Thomas, an employee of the shop, hit

McTush in the mouth. He knew it was McTush because he was familiar with McTush from the neighborhood.

After hearing this testimony by Terrence Watson, the trial court ruled that the photographic identification of McTush made by Terrence Watson on May 24 was impermissibly suggestive and would be suppressed. The trial court further ruled that an independent origin for Terrence Watson's identification existed and therefore an in-court identification of McTush by Terrence Watson would be permitted.

The following pertinent evidence was adduced at the jury trial of McTush.

*Joseph Meier, Chicago Police Officer*

At approximately 5 p.m. on February 20, 1976, he and his partner Officer Santucci responded to a radio call and proceeded to the Kar-Life Battery Shop at 6959 South Ashland, on the northeast corner of Ashland Avenue and 70th Street. The shop has windows facing both streets. Upon walking through the door on the 70th Street side of the shop, he saw a body lying face down on the floor. It was the body of David Thomas. He then proceeded to the rear work area of the shop and found the body of Dennis Harrison. After the arrival of his superiors, he began to question people gathering outside the shop.

On cross-examination, he stated that one of the people he questioned was Terrence Watson. According to Watson, two men were involved in the killing. One of the offenders wore a green coat with white fur trim and the other wore a black coat. The man with the black coat was approximately 18-19 years old. Watson also said that one of the offenders had a fight with David Thomas, a Kar-Life employee, inside the shop. On redirect, he stated that Terrence Watson was very nervous when they talked.

*John Tucker*

He lives on the first floor of the apartment building on the south side of 70th Street across from the Kar-Life Battery Shop. While sitting in his living room around 5 p.m. on February 20, 1976, he saw a brown 1969 or 1970 Oldsmobile park on the south side of 70th Street. Two men got out of the car and walked toward the battery shop. The car's right front fender was damaged. He identified People's Exhibit 10 as a photograph of that car.

On cross-examination, he admitted that he failed to inform the investigating police officer of the damaged fender of the car.

*William Thomas*

He lives in the second floor apartment above John Tucker on 70th Street. On the evening of February 20, 1976, he was reading a newspaper at the seat near the front window of his apartment. Upon looking outside, he noticed a brown car with a black top parked on 70th Street. At that

time, he observed the first three digits of the license plates on the car were either 846 or 648. The car had gained his attention because of its similarity to his wife's car.

On cross-examination, Thomas admitted that he did not know when the car was parked outside or who arrived in the car.

### Terrence Watson

He was 11 years old on February 20, 1976. At approximately 5 p.m. on that day, he and a couple of friends were flying a kite on 70th Street just east of Ashland. He saw a brown Delta 88 Oldsmobile with a black top park on 70th Street. The car had a dent in the right front fender. The driver of the car was wearing a green leather coat with white fur trim and the passenger was wearing a gray leather coat. He identified in court Stone as the driver of the car and McTush as the passenger. He had seen both defendants before that day. When they got out of the car, McTush crossed the street and entered Kar-Life Battery Shop. Stone stood outside the battery shop. Watson went to the window of the shop and looked into the front area of the shop. He saw David Thomas, an employee of the shop, hit McTush in the mouth. McTush pointed a gun at Thomas and shot him several times at close range. At this point, Stone walked past Watson and went inside the shop. He saw Stone walk through the front part of the shop and enter the rear working area out of his view. He then heard three more gun shots. While Stone was in the work area, McTush was going through the pockets of David Thomas. Stone and McTush left the shop and were walking toward him to their car. As they were approaching, he fled east on 70th Street and then ran home. He identified People's Exhibit 10 as a photograph of the car he saw defendants driving that day.

On cross-examination, he denied telling the police on February 20 that he went to the window of the shop after he heard the first set of gun shots or that Stone was the man he saw inside the shop. He further denied telling the police that he ran as soon as Stone saw him. He told a police officer on February 20 that he had seen McTush before that day. He did not recall whether he told the assistant State's Attorney on May 24, 1976, that he knew McTush before February 20. He admitted he viewed a lineup on March 18, 1976, through a one-way mirror and did not identify anyone in that lineup as one of the offenders. On redirect, he stated he was a "little bit" afraid when he saw David Thomas killed. He also stated he had seen McTush about four times prior to February 20, 1976.

### Mrs. Ira Watson

She is the mother of Terrence Watson and was in their apartment on the evening of February 20, 1976. Their apartment is on the second floor of the building adjacent and north of Kar-Life Battery Shop on Ashland Avenue. When Terry was outside playing, she heard several noises that

sounded like gun shots. She looked out of the window, which faced south, and saw a man standing outside of the Ashland Avenue window of the battery shop. The man wearing a green coat with a white collar and a red cap. He entered the shop and went to the rear working area. She again heard noises which sounded like gun shots. After the shots, a man with a gray leather coat came out of the shop and then the man with the green coat exited. They walked south to the corner and turned east on 70th Street. Defendant McTush "strongly resembles" the man in the gray coat, but she could not be positive.

Terry returned home shortly after the second set of gun shots. She asked Terry if David Thomas had been target practicing inside the shop. He said no. She then asked him what were those noises. Terry replied, "Those dudes killed him". Terry looked "very frightened, stunned." Although Terry told her not to go down to the battery shop, she did. She discovered Thomas' body on the floor in the front of the shop and then called the police. Later that night, she noticed Terry was still frightened and would not sleep apart from his parents.

The next day February 21, 1976, she and Terry were brought to the police station to observe a lineup. Terry was nervous and frightened and did not want to go to the police station. On March 18, 1976, they were brought to the police station to observe another lineup. Terry was again reluctant and appeared frightened. After viewing the lineup, she said one of the men "strongly resembled" the man in the gray coat. That man was McTush.

On cross-examination, she denied telling the police one of the men wore a black leather coat. She admitted she never saw a complete frontal view of the man in the gray coat. She believes Terry told the police prior to May 24, 1976, that he had seen McTush in the neighborhood before February 20, 1976.

*Rosalind Patterson*

She knew defendant McTush for approximately a year and a half prior to February 20, 1976. She and McTush jointly owned a brown 1969 Delta 88 Oldsmobile. The car had a black top and the right front fender was damaged. She identified People's Exhibit 10 as a photograph of their Delta 88 Oldsmobile as it appeared on February 20, 1976. On that day, she saw the defendant in the Delta 88 at 9:30 a.m. and at noon. At approximately 6:05 p.m. that evening, McTush drove to her home in the Delta 88. He was wearing a gray leather coat. When she left her home about 25 minutes later she took the Delta 88 and left him another car which they also jointly owned.

On cross-examination, she stated the reason why she took the Delta 88 was because the heater did not work on the other car. She said an

assistant State's Attorney suggested that she testify that McTush told her to exchange cars the evening of February 20. She said this was not the truth. On redirect examination, she admitted signing a statement on February 22, 1976, in which she stated that McTush told her to exchange cars. This statement was given before she ever talked to an assistant State's Attorney.

*Clifford Lawrence*

He lived with his wife at 7126 South Honore. McTush and Stone lived with them on a part-time basis. Between 5 p.m. and 5:30 p.m. on February 20, 1976, Stone and McTush came home. They stayed in the house approximately 25 minutes to change clothes and then left separately. He asked McTush where he had been all day. McTush said he had been to visit his brother in Joliet, Illinois, and had left Joliet for Chicago at 3:15 p.m.

On cross-examination, he admitted that McTush came into the house about five minutes after Stone. He didn't notice the color of the coat McTush was wearing. He didn't see McTush change clothes or leave the house because he had fallen asleep.

*William Richardson*

As general manager of the Kar-Life Battery Company, one of his duties was to pick up the receipts from the Kar-Life Battery Shop at 6959 South Ashland. Every two days he would go to the battery shop and pick up the receipts from David Thomas. Generally, Thomas carried the receipts in his pocket. On the morning of February 20, 1976, he called Thomas and asked him, "if he had a lot of money." Thomas said no. After being notified of the homicides, he went to the battery shop at approximately 6:45 p.m. He searched for the receipts, but found no money.

*Mary Ann Moran, Microanalyst, Chicago Police Department*

Upon examination of powder burns on the clothes worn by David Thomas on the day he was killed, she was able to determine he was shot at close range.

*Thomas Morley, Chicago Police Officer*

On April 15, 1975, he spoke with a man who identified himself as John McTush. McTush said he lived at 7006 South Ashland and 7126 South Honore.

On cross-examination, he admitted he had never been to either of these addresses and that he was a Chicago police officer. On redirect examination he identified McTush in court.

*John McKennon, Chicago Police Officer*

On March 20, 1975, he spoke with McTush. McTush told him he lived at 7006 South Ashland Avenue.

On cross-examination, he admitted he had not been to McTush's apartment at 7006 South Ashland and that he was a Chicago police officer.

Before resting the State's case, a certified copy of a license application filed by Rosalind Patterson and John McTush was entered into evidence. The license application revealed that their jointly owned 1969 Oldsmobile was issued license plate 846 645 on January 27, 1976.

*For the defendant, John McTush*
*John Ridges, Chicago Police Officer*

On February 21, 1976, he was assigned to investigate the murders of David Thomas and Dennis Harrison. In the course of the investigation, on March 18, 1976, McTush was placed in a lineup with four other men. Mrs. Ira Watson and her son Terrence separately viewed the lineup through a one-way mirror. Neither of them made a positive identification of McTush at that time.

On May 24, 1976, he brought Mrs. Watson and Terrence to an interview with an assistant State's Attorney. He was present at the interview between the assistant State's Attorney and Terrence. During the interview, Terrence never said he knew McTush from the neighborhood. It was not until October 6, 1977, that he learned that Terrence Watson knew McTush from the neighborhood.

On cross-examination, he described Terrence Watson at the March 18 lineup as "fidgety," "nervous," and "very afraid." In addition, Watson's "eyes were watering" and "his speech was hesitant." Mrs. Watson identified McTush in the March 18th lineup as having "all the physical characteristics" of one of the men she saw at the scene of the crime.

*Investigator Thomas Quinn, Chicago Police Department*

He interviewed Terrence Watson and Mrs. Watson at their apartment and later at the police station on February 20, 1976. Terrence Watson told him he saw two men enter the battery shop and then he heard gun shots. After hearing the gun shots, Terrence ran to the window of the shop. Terrence saw a man, who was bleeding from the mouth, standing over the body of David Thomas. When the man saw Terrence outside the window, Terrence ran. He is unsure whether it was Terrence Watson or another witness who said the man standing over David Thomas was wearing a green coat. He does recall that Terrence Watson said one man was wearing a green coat and the other man was wearing a black leather coat. He does not recall whether Terrence Watson saw either of the men shoot someone.

On cross-examination, he testified that Terrence Watson was "terrified" when he interviewed him shortly after the murders. Terrence was very reluctant to talk about what he had seen and would volunteer no

information. Later that evening at the police station, Terrence remained frightened and reluctant to talk. He believes that without Mrs. Watson's persuasion, Terrence would not have talked with the police.

*Father T. Kimbell Cannon*

He is a chaplain at the Cook County Jail. On February 20, 1976, he was at the Stateville Penitentiary in Joliet, Illinois, to hold religious services. At approximately 3:25 p.m. on February 20, he saw McTush at the front gate of the penitentiary. They talked for about five minutes.

On cross-examination, he admitted that his memory of the specific time he saw McTush is based on the sign-in sheet kept at the penitentiary.

*Edward Jordan*

As an employee of Stateville Penitentiary, he keeps records of the visitors of each prisoner. From these records, he testified that on February 20, 1976, prisoner Nathaniel McTush was visited by defendant McTush and Doris Walker.

On cross-examination, he stated that the visitors sign-in sheet for the visiting room indicates that McTush and Doris Walker were with Nathaniel McTush from 2:20 p.m. to 3:00 p.m. on February 20, 1976.

*John Eric McKenzie*

In February 1976, he was program director of the Youth Development Program in Joliet, Illinois. At 3:45 p.m. on February 20, 1976, he was visited at the Youth Center by McTush and a woman named Doris. He was a friend of McTush. After leaving the Youth Center, McTush, Doris and he went to his home and had dinner. They stayed at his house until approximately 5:10 p.m. when McTush and Doris left. He remembers the events of this day because it was the last day of rehearsals for a play he was coordinating and the only time he met Doris.

On cross-examination, he could not remember the number of visits McTush paid him during February 1976 or the time, day of the week, or dates of those visits. He admitted telling an assistant State's Attorney that he did not remember anything unusual or distinctive about February 20, 1976, but would check his time sheets to be certain. His time sheets do not reflect the visit of McTush and Doris or that rehearsals for a play were held that day.

*Michael Kearney*

On February 20, 1976, he was walking south on Ashland Avenue toward 69th Street, when he heard gun shots coming from the Kar-Life Battery Shop. After the shots stopped, a van pulled out of the battery shop's driveway and went south on Ashland. He did not see anyone come out of the battery shop or get into the van.

*Steve Coleman*

He worked at a gas station at 7100 South Ashland Avenue on February 20, 1976. At approximately 3:45 p.m., a van drove into the gas

station for air. The driver of the van was wearing a green leather coat with a white fur collar and the passenger was wearing a green army fatigue jacket. Fifteen minutes after the van left the station, he heard two gun shots. About 10 minutes later, the van returned for gas and then left without paying for the gas.

On cross-examination, he denied telling the police on February 20, 1976, that he was unable to describe the clothing of the occupants of the van.

*For the State—Rebuttal*

The State offered evidence that an automobile trip between Stateville Penitentiary in Joliet, Illinois, to the Kar-Life Battery Shop on a Friday afternoon takes between 53 to 59 minutes. An investigator for the State's Attorney testified that John McKenzie told him that nothing distinguished February 20, 1976, from any other visit he received from McTush. Finally, a Chicago police officer testified that Steve Coleman was unable to furnish a clothing description of the occupants or van which stopped at his gas station on February 20, 1976.

On appeal, McTush contends that: (1) the pretrial identification procedures were so unnecessarily suggestive and conducive to mistaken identification as to deny him due process of law; (2) the trial court improperly limited his examination of a State witness; (3) the trial court improperly prevented him from impeaching a State witness with prior inconsistent statements; (4) acts of prosecutorial misconduct denied him a fair trial; and (5) he was not proved guilty beyond a reasonable doubt.

We now turn our attention to the pertinent evidence adduced at the bench trial of Stone. Initially, we note that the direct examination of each State witness in the McTush trial also served as evidence in Stone's trial and therefore, we will not repeat that evidence. The only exception is State witness Clifford Lawrence. Additional evidence taken from Lawrence was admitted only in Stone's trial and is recounted below. However, testimony elicited during cross-examination of State witnesses is relevant and discussed below.

*For the State*

*Joseph Meier, Chicago Police Officer*

On cross-examination, Meier admitted that Watson told him the offender, who was hit by David Thomas, was the man with the black coat.

*Terrence Watson*

On cross-examination, Terrence denied telling any of the police officers on February 20 that he went to the window of the battery shop after he heard the gun shots. He admitted telling the grand jury on May

24, 1976, that he went to the window after he heard the shots. He denied telling the police that Stone's green coat had white fur trim on the bottom and on the cuffs. He viewed a lineup on February 21, 1976, but did not identify anyone in that lineup as one of the offenders. He admitted that from February 21 to May 24, 1976, he did not tell anyone that he recognized a participant in the February 21 lineup. On redirect, he stated he had seen defendant Stone about four times prior to February 20, 1976. He did not tell the police that Stone was involved in these crimes or that he was in the February 21 lineup because he was afraid. On May 24, 1976, he identified Stone from a photograph of the February 21 lineup.

### Mrs. Ira Watson

On cross-examination, she testified it was getting dark at the time of the occurrence, but she could still see. The window of her apartment is approximately 55 feet from where the man in the green coat was standing outside of the shop. He was standing there a few seconds before entering the shop. She admitted having only a sideview of the man in the green coat. She doesn't recall telling the police that the green coat had fur trim on the cuffs and the hem.

### Clifford Lawrence

He lived with his wife at 6126 South Honore. McTush and Stone lived with them on a part-time basis. When Stone came home between 5 and 5:30 p.m. on February 20, he had a conversation with Stone. He asked Stone, "Man, what's wrong?" Stone replied, "I just got through popping two dudes." Sometime after midnight that day, he had another conversation with Stone. He asked Stone whether he had anything to do with the robbery on 70th Street that day. Stone threw up his hands, smiled, and said nothing.

On cross-examination, he admitted that as of February 21, 1976, he had a weapons charge pending against him. He did not recall telling Rosalind Patterson on February 22 that one of the men killed at the battery shop was his friend.

### For the defendant Lonzell Stone

#### Investigator Thomas Quinn, Chicago Police Department

He was assigned to investigate the murder at the Kar-Life Battery Shop on February 20, 1976. During the course of his investigation, he interviewed Terrence Watson. Watson told him that he ran to the window of the battery shop after he heard the gun shots. Based on his interviews with people at the scene, he filed a police report containing descriptions of the two offenders. The driver was described as wearing a green leather coat with white fur trim on the collar, cuffs and bottom. According to the report, Terrence Watson saw the man with the green coat standing over the body of David Thomas. The man's lip was cut.

Defendant Stone and the People agreed by stipulation to the following facts. On February 22, 1976, Clifford Lawrence told Rosalind Patterson that he was a friend of the man who was killed at the battery shop, and that it was a shame he was killed. Terrence Watson testified before the grand jury that he went to the window of the battery shop after he heard the gun shots.

On appeal Stone contends that: (1) he was denied his statutory right to a speedy trial; (2) the evidence was insufficient to sustain the convictions for armed robbery; (3) he was not proved guilty beyond a reasonable doubt; (4) the judgment against him must be modified to conform to the jury's verdicts against defendant McTush; and (5) his sentence was excessive.

With the goal of clarity in mind, we will first discuss the contentions raised by McTush and then turn to the contentions raised by Stone.

OPINION

Defendant McTush first contends that the suppression hearing was conducted improperly and as a result, he was identified in court by Terrence Watson. More specifically, he maintains the trial court improperly placed the burden of proving an independent origin for Terrence Watson's identification on him rather than the State. Additionally, he contends no evidence was elicited as to Watson's opportunity to observe the crime and his previous variant descriptions of the criminals to the police.

■■ The State's response initially is that defendant has waived this error by failure to allege it with specificity in his motion for a new trial. The general rule is that failure to allege errors specifically in the motion for a new trial constitutes a waiver of those issues. (*People v. Donnenfeld* (1978), 62 Ill. App. 3d 991, 379 N.E.2d 710.) The purpose of this rule is to provide the trial court an opportunity to correct alleged errors and to give the reviewing court the benefit of the trial court's judgment. (*People v. Irwin* (1965), 32 Ill. 2d 441, 207 N.E.2d 76.) Where the issues have in fact been brought to the attention of the trial court, ruled on by the trial court, and involved the potential of substantial prejudice to the defendant; the rule of waiver may be relaxed, in the discretion of the reviewing court, to decide the issue on its merits. *People v. Gray* (1977), 47 Ill. App. 3d 1026, 365 N.E.2d 501.

In his motion for a new trial, McTush alleged as error that the trial court "failed to conduct a proper hearing on defendant's motion to suppress the identification testimony of witnesses Terrence and Ira Watson." Assuming without deciding that this motion lacks sufficient specificity to preserve the alleged error for review, we note that the trial court held a hearing on McTush's motion to suppress and then ruled on

that motion. The court also ruled on his motion for a rehearing on this issue. Moreover, the identification testimony of Terrence Watson at trial forms the foundation of the State's case. The potential for substantial prejudice to McTush by the improper admission of this evidence is beyond dispute. Since we have the benefit of the trial court's judgment on this issue and it involves substantial prejudice, we will decide the issue on its merits.

● ■ A defendant has a right to a full and fair pretrial hearing to determine whether a witness' identification of him was based solely on the witness' independent observation of the crime or whether it was influenced by unnecessarily suggestive police procedures or other extraneous factors which may have unduly affected the judgment and conclusion of the witness. (*People v. Robinson* (1970), 46 Ill. 2d 229, 263 N.E.2d 57.) In order to suppress identification evidence, a defendant has the burden of proving that the identification procedures were so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) Where the pretrial identification is found to be inadmissible, an in-court identification will be admitted if the State can prove by clear and convincing evidence that the in-court identification had an independent origin arising from other uninfluenced observations of the defendant. (*People v. Lee* (1973), 54 Ill. 2d 111, 295 N.E.2d 449.) In *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, the Supreme court rejected a *per se* rule of exclusion of identification evidence following unnecessarily suggestive confrontation procedures. The *Manson* court stated:

> "We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony * * * . The factors to be considered are set out in Biggers [*Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401] 409 U.S. at 199-200. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253. Accord, *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.

■■ At the pretrial hearing in the case at bar, the trial court heard Officer Ridges' testimony concerning the identification procedures conducted on March 18, 1976, and May 24, 1976. Following this testimony the trial court found the identification procedures of May 24 to be unnecessarily

suggestive and presented a substantial likelihood of irreparable misidentification. Consequently, it asked for evidence of independent origin. The trial court then entered the following exchange with the defense counsel:

"DEFENSE COUNSEL: You are looking for an independent basis?

TRIAL COURT: Yes.

DEFENSE COUNSEL: But you want me to elicit it.

TRIAL COURT: Yes, go ahead."

Pursuant to the trial court's request, defense counsel called Terrence Watson to the stand to offer evidence of independent origin. It is beyond question that the burden of proving independent origin rests on the State. (*Lee; People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152; *People v. Beyah* (1979), 72 Ill. App. 3d 690, 391 N.E.2d 96; *People v. Hatcher* (1977), 45 Ill. App. 3d 374, 359 N.E.2d 1157.) Consequently, the trial court committed error when it placed the burden of proving independent origin on the defendant.

■■ Defendant further contends the trial court improperly concluded the hearing without hearing evidence of the witness' opportunity to view the crime and of inaccurate description of the criminals given to the police by the witness. At the suppression hearing, Terrence Watson testified that he was at the window of the Kar-Life Battery Shop on February 20, 1976, and he saw David Thomas hit McTush. Terrence Watson stated that he knew McTush from the neighborhood. Again, we note this testimony was elicited on direct examination by the defendant. After hearing this testimony, the trial court terminated the hearing and ruled that Terrence Watson would be allowed to identify McTush in court because an independent origin for the identification existed. This ruling was premature because the trial court heard no testimony on the witness' opportunity to view the crime, the witness' failure to identify defendant at the March 18 lineup, and the witness' alleged inaccurate descriptions of the criminals given to the police on the day of the crime. This evidence was clearly relevant as determinants of the reliability of the identification under the *Manson* decision and, in addition, should have been elicited by the State and been subject to the cross-examination of the defendant. Therefore, error was committed by the State's failure to meet its burden of proving independent origin and by the trial court's failure to consider relevant evidence, outlined above, in ruling on the admissibility of an in-court identification.

■■ The State contends, however, that any error committed during the suppression hearing was rendered harmless by the evidence adduced at trial. Where error is committed either in the procedure of a hearing to suppress identification testimony or in rulings made during the hearing,

the error may be harmless if the reviewing court, on the basis of an informed judgment, can perceive from the trial record the presence of an independent origin for the in-court identification. (*People v. Hatcher* (1977), 45 Ill. App. 3d 374, 359 N.E.2d 1157; *People v. Seets* (1976), 37 Ill. App. 3d 369, 346 N.E.2d 61.) If, however, the reviewing court cannot reach an informed judgment as to whether the witness' identification has an independent origin, then the conviction will be vacated pending a hearing in the trial court to allow the State to prove an independent origin for the identification. *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152.

■■ Although the trial record contains some relevant evidence, it does not permit an "informed judgment" as to whether Terrence Watson's identification of McTush had an independent origin. Specifically, the record does not contain evidence of the lighting conditions both inside and outside of the battery shop, the distance between Watson and the criminals at the time of the viewing, the length of time for the observation, Watson's degree of attention, and any obstacles impeding Watson's view of the criminals. Also, no evidence was adduced as to whether Watson had a frontal view of each criminal and, if so, for how long. When these omissions are combined with (1) Watson's failure to identify defendant McTush at the March 18 lineup, (2) the alleged disparity between the descriptions he gave to the police on February 20 and the defendant's actual description, and (3) the length of time between the crime and the confrontation; serious questions as to the reliability and independent origin of the in-court identification remain.

■■ ■ Accordingly, we vacate the judgments of conviction against McTush, pending a hearing in the trial court at which the State will be given the opportunity to prove the reliability of the in-court identification and its origin independent of the improperly suggestive identification procedures. (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152.) McTush must be afforded a new trial if the identification testimony of Terrence Watson is found to have been inadmissible, since the erroneous admission of this testimony must be deemed prejudicial as Watson was the only eyewitness to the crime. (See *People v. Holiday* (1970), 47 Ill. 2d 300, 265 N.E.2d 634.) If, however, the identification is shown to be reliable and of independent origin, the trial court will enter a new judgment reinstating the conviction. (*Blumenshine.*) Consequently, we must consider the other issues raised in this appeal.

■■ McTush's second contention on appeal is that the trial court improperly limited his examination of Officer Ridges. During defendant's direct examination of Officer Ridges, defense counsel attempted to elicit testimony from Ridges of prior statements by Terrence Watson. Defendant contends these statements would impeach Watson's

testimony. We note initially that regulation of direct examination of witnesses is largely a matter left to the sound discretion of the trial court. (*People v. Diaz* (1971), 1 Ill. App. 3d 988, 275 N.E.2d 210.) Before prior inconsistent statements can be offered to impeach the testimony of a witness, the proper foundation must be laid during the cross-examination of the witness. (*People v. Powell* (1973), 53 Ill. 2d 465, 292 N.E.2d 409.) The purpose of this rule is to alert the witness, to avoid unfair surprise, and to give the witness an opportunity to deny or explain the prior statement. (*People v. Ellis* (1976), 41 Ill. App. 3d 377, 354 N.E.2d 369.) A proper foundation consists of two requirements; first, the witness must be questioned as to the time, place and persons present in the alleged conversation and second, the witness must be asked whether he made the inconsistent statement at that time. (*People v. Ellis* (1976), 41 Ill. App. 3d 377, 354 N.E.2d 369.) Where the witness denies making the statement or does not recall making the statement, a foundation is laid for subsequent impeachment. See *People v. Bush* (1963), 29 Ill. 2d 367, 194 N.E.2d 308, *cert. denied* (1964), 376 U.S. 966, 11 L. Ed. 2d 983, 84 S. Ct. 1129.

■■ On direct examination, defense counsel asked Officer Ridges whether Terrence Watson said at the May 24 interview that McTush lived across the street from him. The State objected and the trial court sustained the objection. In explaining its ruling, the trial court stated the answer of Officer Ridges would not be impeaching because there is no testimony of Terrence Watson denying that he made this statement. After a careful review of the record, we were unable to discover the requisite foundation testimony. At no time did defense counsel ask Terrence Watson if he told Officer Ridges that McTush lived across the street. Consequently, the trial court properly sustained the State's objection.

McTush's third contention on appeal is that the trial court improperly prevented him from impeaching Terrence Watson on cross-examination with his prior inconsistent statements before the grand jury. More accurately, we note that defendant's attempt to impeach Terrence Watson with his grand jury testimony occurred during defendant's re-cross-examination of Watson.

The scope of cross-examination rests within the sound discretion of the trial court, and the trial court's ruling will be disturbed only if there is a clear abuse of discretion, resulting in manifest prejudice to the defendant. (*People v. Ganci* (1978), 57 Ill. App. 3d 234, 372 N.E.2d 1077.) Further, the scope of re-cross-examination is limited to matters brought out on redirect examination. *People v. Pagan* (1972), 52 Ill. 2d 525, 288 N.E.2d 102.

■■ On direct examination, Terrence Watson testified that he went to the window of the battery shop before he heard the gun shots. During cross-examination by defendant McTush, Terrence Watson denied telling the

police on February 20, 1976, that he went to the window of the battery shop after he heard the shots. No attempt was made by defense counsel to impeach Watson on this point with his grand jury testimony. On redirect examination, no testimony was elicited as to when Watson went to the window of the battery shop. Finally, on re-cross-examination, defense counsel tried to impeach Watson on this point with his grand jury testimony. The trial court sustained the State's objection to this question. We believe the trial court did not abuse its discretion by limiting re-cross-examination to matters brought out on redirect.

■■ McTush's fourth contention on appeal is that acts of prosecutorial misconduct during the course of the trial deprived him of a fair trial. The State maintains the defendant has waived any errors resulting from acts of prosecutorial misconduct by failing to allege specifically these instances of misconduct as error in his motion for a new trial. As we have previously stated, failure to specify alleged errors in the matter for a new trial constitutes waiver of those issues for review. (*People v. Donnenfeld* (1978), 62 Ill. App. 3d 991, 379 N.E.2d 710.) McTush's motion for a new trial fails to allege specifically these acts of prosecutorial misconduct as error. Therefore, we must consider these issues waived for review.

McTush's final contention on appeal is that he was not proved guilty beyond a reasonable doubt. In support of this contention, he cites the weakness of the identification testimony of Watson and the strength of the alibi testimony presented by the witness in his behalf.

A reviewing court will not set aside a jury's verdict unless the evidence is so improbable or palpably contrary to the verdict as to raise a reasonable doubt of guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) It is the function of the trier of fact to determine the credibility of the witnesses and the weight to be given to their testimony and the inferences to be drawn therefrom. (*People v. Harris* (1972), 53 Ill. 2d 83, 288 N.E.2d 873.) Where the identification of the accused is at issue, a positive identification by a single witness, who had ample opportunity for observation, will be sufficient to sustain the conviction. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) The conviction will stand even though the testimony of the identification witness is contradicted by the defendant's alibi witnesses. *People v. Alexander* (1978), 65 Ill. App. 3d 559, 382 N.E.2d 519.

■■ After a careful review of the record, we believe the evidence was not so improbable or unreasonable as to raise a reasonable doubt of McTush's guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) Terrence Watson made a positive identification of McTush at trial, and gave a detailed account of what he saw happen inside the battery shop on February 20. Several witnesses placed McTush's car at the scene of the crime. Rosalind Patterson told the jury McTush was wearing a gray

leather coat on the evening of February 20. In addition, the testimony of the microanalyst corroborates Watson's account of the close-range shooting of David Thomas. Mrs. Watson's testimony placed McTush at the scene of the crime and coincided with Terrence's account chronologically. Consequently, we believe the evidence is sufficient to establish McTush's guilt beyond all reasonable doubt.

■■ McTush argues, however, that Terrence Watson's testimony was incredible in four respects. First, Watson told Officer Quinn that the passenger of the car wore a black leather coat. At trial, Watson testified that McTush wore a gray leather coat. We note, however, that precise accuracy in describing the clothing of the offender is not necessary where the identification is otherwise positive and a discrepancy on this point affects only the weight to be given the identification testimony. (*People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915; *People v. Seets* (1976), 37 Ill. App. 3d 369, 346 N.E.2d 61.) Second, McTush points out that Terrence Watson told Officer Quinn that he ran to the window after he heard the gun shots. Terrence Watson denied making this statement and said that he was at the window before the first set of gun shots were fired. The existence of prior inconsistent statements does not render a witness' identification invalid, but affects the weight to be afforded the identification by the jury. (*Harrison.*) Third, McTush relies heavily on Watson's failure to identify him at the March 18 lineup. A witness' failure to make a positive identification of the defendant at a lineup does not vitiate the reliability of the witness' identification, but rather goes to the weight of the identification testimony and is to be evaluated by the jury. (*People v. Lawson* (1977), 52 Ill. App. 3d 343, 367 N.E.2d 560.) In addition, in the present case, Watson's failure to identify McTush may be attributed to his fear of what would happen if he did. Where a witness fails to identify the defendant or delays in making the identification out of fear, this evidence affects only the weight of the witness' identification. (*People v. Orr* (1977), 45 Ill. App. 3d 660, 359 N.E.2d 1237.) Fourth, McTush refers us to the time span between the commission of these offenses, February 20, 1976 and Watson's initial identification of him on May 24, 1976. This evidence alone does not render an identification invalid and its damaging effect, if any, is mitigated by the fact that the witness had seen the defendant before the time of the crime. *People v. Morris* (1978), 65 Ill. App. 3d 155, 382 N.E.2d 383.

■■ All of the points raised by McTush affect the weight of Watson's identification and were considered by the jury. The jury which saw and heard the evidence was in a superior position to assess credibility, and its determination will not be set aside unless evidence is so unsatisfactory as to leave a reasonable doubt of defendant's guilt. (*People v. Houck* (1977), 50 Ill. App. 3d 274, 365 N.E.2d 576.) After a review of the record, we do

not believe matters of credibility referred to by McTush were sufficient to raise a reasonable doubt of guilt.

He also maintains that the testimony of Father Cannon and John McKenzie establishes that he was in Joliet at the time of the killings or, at the least, raises a reasonable doubt as to whether he could have been at the battery shop. Basically, this evidence raises a question of credibility for the jury, and, in this case, the jury obviously believed the witnesses for the State. As we have noted, a positive identification by a single witness, who had ample opportunity for observation, will sustain a conviction even if contradicted by the alibi testimony of the defense witnesses. (*People v. Alexander* (1978), 65 Ill. App. 3d 559, 382 N.E.2d 519.) Further, the trier of fact is free to reject alibi testimony. (*People v. Jackson* (1973), 54 Ill. 2d 143, 295 N.E.2d 462.) Consequently, we find the evidence not to be so improbable as to raise a reasonable doubt of defendant's guilt and that there is ample evidence to support the jury's verdict.

Defendant Stone first contends that he was denied his statutory right to a speedy trial. Under the Speedy Trial Act, a defendant who is in custody must be tried within 120 days of having been taken into custody, "unless delay is occasioned by the defendants." (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(a).) Where the delay is attributable to the defendant, the statutory period is tolled, and a new period begins to run from the date to which the trial was delayed. (*People v. Donalson* (1976), 64 Ill. 2d 536, 356 N.E.2d 776.) The test for determining if a delay is attributable to the defendant is whether the defendant's acts in fact caused or contributed to the delay. (*People v. Shields* (1974), 58 Ill. 2d 202, 317 N.E.2d 529.) A defendant must be charged with a delay even where the record attributes the continuance to another party. (*People v. Bracey* (1977), 52 Ill. App. 3d 266, 367 N.E.2d 351.) Further, where it is unclear that a delay is attributable to the defendant, the reviewing court will examine the circumstances surrounding the granting of the continuance to ascertain if the delay is attributable to the defendant. *People v. Gooding* (1975), 61 Ill. 2d 298, 335 N.E.2d 769.

In the present case, Stone concedes that from the time he was taken into custody to May 4, 1977, all delays were attributable to him. On May 4, 1977, he agreed to a continuance to June 16, 1977. But on May 13, 1977, he moved to advance the cause from June 16 to May 13 for a hearing on his motion to reduce bond. The trial court granted Stone's motion and held a hearing on May 13 on his motion to reduce bond. At the end of the hearing, the trial court denied Stone's motion. After the court's ruling, the following exchange occurred:

"COURT: Motion to reduce bail will be denied.

DEFENSE COUNSEL: Thank you, Judge. May I ask that this matter be reset for the same date?

COURT: Order of court, cause set—what was the date?

DEFENSE COUNSEL: June 16th, Judge."

The record states that the continuance to June 16 was by order of court. Trial of this matter was begun on October 13, 1977.

Stone contends his 120-day term began on May 13, and expired on September 10, 1977. He argues that the delay from May 13 to June 16 was by order of court and not attributable to him. The State maintains the delay from May 13 to June 16 was attributable to Stone, and that the 120-day term did not expire until October 19, 1977.

In support of his argument, Stone refers to *People v. Zuniga* (1973), 53 Ill. 2d 550, 293 N.E.2d 595, where the Illinois Supreme Court held that a court's granting of defendant's motion to advance for a hearing on a second defense motion triggered the running of the defendant's term. Even assuming that defendant Stone's motion to advance for a hearing on his motion to reduce bond triggered the running of his term; defendant's right to a speedy trial was not violated if the delay from May 13 to June 16 is attributable to him.

We believe that, at the very least, Stone contributed to the delay from May 13 to June 16 when he, on his own initiative, asked the court to reset the matter for June 16. (See *People v. Shields* (1974), 58 Ill. 2d 202, 317 N.E.2d 529.) Consequently, the delay from May 13 to June 16 is attributable to Stone, and a new 120-day term began on June 16. To ensure the running of his term from May 13, Stone, on that date should have demanded immediate trial without further continuance, rather than agree to a continuance to June 16. (See *People v. Criss* (1977), 45 Ill. App. 3d 973, 360 N.E.2d 543.) Accordingly, we hold that Stone was not deprived his statutory right to a speedy trial.

Stone's second contention is that the State failed to adduce sufficient evidence to prove he committed or was accountable for the offenses of armed robbery. More specifically, he argues that the State failed to prove that any property was taken from the person or presence of either David Thomas or Dennis Harrison. Under Illinois law, a person commits robbery when he takes property from the person or presence of another by the use of force or threatening the use of imminent force. (Ill. Rev. Stat. 1975, ch. 38, par. 18—1.) The crime of armed robbery takes place when a person commits a robbery while armed with a dangerous weapon. (Ill. Rev. Stat. 1975, ch. 38, par. 18—2.) A defendant may be convicted of the substantive offense of armed robbery committed by another, if:

> "Either before or during the commission of an offense [armed robbery], and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such

other person in the planning or commission of the offense [armed robbery]." (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c).) We note also that a conviction for armed robbery may be sustained on circumstantial evidence, where the evidence adduced was of a conclusive nature and produced a reasonable and moral certainty that the offense charged was actually committed by the defendant. *People v. Wilson* (1976), 37 Ill. App. 3d 560, 346 N.E.2d 161.

Stone was found guilty by the court "in manner and form as charged in the indictment." According to Illinois law, a finding of guilty "in manner and form as charged in the indictment" is a finding of guilty as to all counts of the indictment. (*People v. Spector* (1964), 47 Ill. App. 2d 103, 196 N.E.2d 507.) Therefore, Stone was found guilty of the armed robbery of both David Thomas and Dennis Harrison. The evidence showed that David Thomas, an employee of the Kar-Life Battery Shop, customarily carried the cash receipts from the shop in his pocket. On the morning of February 20, 1976, Thomas told William Richardson, the general manager of Kar-Life, that business was slow that day. When Richardson asked whether he had a lot of money, Thomas said no. At approximately 5 p.m. that day, McTush entered the battery shop and shot David Thomas. While McTush was going through the pockets of David Thomas, Stone entered the shop and proceeded to the rear of the shop where he shot Dennis Harrison. After the bodies of the victims were discovered, Richardson came to the shop and searched for the day's cash receipts. He did not find any of the receipts.

The question of the sufficiency of circumstantial evidence to prove a "taking" necessary to sustain a conviction for armed robbery was presented in *People v. Wilson* (1976), 37 Ill. App. 3d 560, 346 N.E.2d 161. In that case, the victim, who was driving from Kentucky to Wisconsin, parked on the roadside to sleep for the night. Defendant apparently shot the victim as he slept. The police later discovered the victim's empty wallet outside the victim's vehicle. Thus, no direct evidence of a taking of property from the victim was produced at trial. Affirming the armed robbery conviction, the court reasoned that a jury could reasonably infer from the evidence that a person travelling several hundred miles on the highway would have money in his possession.

Similarly, in the instant case, we believe there is sufficient evidence for the jury to infer that David Thomas had some cash receipts on him at the time of his death. Thomas' statements that business was slow and that he did not have a lot of money on him allowed the jury to reasonably infer that some business had been conducted that morning and, as a result, he did have some money on him. We, therefore, affirm Stone's armed robbery conviction of David Thomas.

■■ With regard to Stone's conviction of armed robbery of Dennis Harrison, the State candidly admits that the evidence at trial was insufficient to support a conviction for armed robbery. We agree. No evidence was adduced that property was taken from the person or presence of Dennis Harrison. Consequently, Stone's conviction for the armed robbery of Dennis Harrison is reversed.

Stone's third contention on appeal is that he was not proved guilty beyond a reasonable doubt. He argues that the identification testimony of Terrence Watson is not strong enough to support his conviction.

■■ We have previously reviewed the Illinois law on the function of a reviewing court in determining whether a defendant has been proved guilty beyond a reasonable doubt. The evidence against Stone is overwhelming. Terrence Watson identified him as the second man in the shootings of February 20. Clifford Lawrence testified that shortly after the murders of Thomas and Harrison defendant Stone said, "I just got through popping two dudes." We believe there was ample evidence in support of the court's finding of guilty. As we have noted above, minor discrepancies as to the suspect's clothing, prior inconsistent statements by the identification witness, and the witness' failure to identify the defendant at an earlier lineup affect the weight of the identification testimony and are to be evaluated by the trier of fact. (See *People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915; *People v. Lawson* (1977), 52 Ill. App. 3d 343, 367 N.E.2d 560.) The court, who saw and heard the evidence, determined the credibility of the witness and the weight to be afforded their testimony. The trial court found Stone guilty and we do not believe the evidence was so improbable as to raise a reasonable doubt of defendant's guilt.

■■ Stone's fourth contention on appeal is that an inconsistency between the verdict rendered against him by the trial court and the verdict rendered against defendant McTush by the jury raises a reasonable doubt as to his guilt. The State maintains that Stone has waived this issue by failure to allege it as error specifically in his motion for a new trial. We agree. Stone's failure to raise this issue in his motion for a new trial constitutes a waiver of the issue for review. *People v. Donnenfeld* (1978), 62 Ill. App. 3d 991, 379 N.E.2d 710.

■■ Stone's final contention on appeal is that his sentence of from 25 to 50 years imprisonment is excessive. In light of our reversal of defendant Stone's conviction for the armed robbery of Dennis Harrison, we must vacate his sentence because the trial court may have considered this conviction in imposing the sentence. (*People v. Deal* (1979), 69 Ill. App. 3d 74, 387 N.E.2d 21; *People v. McGaha* (1973), 10 Ill. App. 3d 1051, 295 N.E.2d 476.) Although the sentence imposed here may have been warranted in light of the crimes for which the defendant has been

convicted and defendant's background, we conclude that the case must be remanded for a reconsideration of the sentence. We express no opinion as to the sentence which should be imposed.

To summarize, with regard to McTush, the judgment of the circuit court of Cook County is vacated and the cause is remanded to the circuit court for further proceedings in accordance with the views expressed herein.

With regard to Stone, we reverse the conviction for the armed robbery of Dennis Harrison; affirm the remaining convictions; vacate the sentence; and remand the cause with directions to hold a new hearing in mitigation and aggravation and thereafter to resentence the defendant.

Reversed in part; affirmed in part.

Sentence vacated and remanded with directions.

SULLIVAN, P. J., and MEJDA, J., concur.