**UNITED STATES of America ex rel. John McTUSH a/k/a Maulana Modibo Eusi, Petitioner,**

**v.**

**Jerry O'BRIEN, Warden, U.S. Penitentiary at Leavenworth, and the Attorney General of the State of Illinois, Respondents.**

**No. 85 C 5023.**

United States District Court, N.D. Illinois, E.D.

Sept. 26, 1986.

John McTush, a/k/a Maulana Modibo Eusi, pro se.

Anton R. Valukas, U.S. Atty. by Barbara Lazarus, Asst. U.S. Atty., Chicago, Ill., for federal respondent.

Neil F. Hartigan, Atty Gen., State of Ill. by Sally L. Dilgart, Asst. Atty. Gen., Chicago, Ill., for state respondent.

## MEMORANDUM ORDER

BUA, District Judge.

This case is before the Court on a petition for a Writ of Habeas Corpus. 28 U.S.C. § 2254. Now pending is the respondents' motion of summary judgment. For the reasons stated herein, summary judgment is granted for the respondents.

### FACTS

Petitioner, John McTush, was tried by a jury in the Circuit Court of Cook County and found guilty of murder, Ill.Rev.Stat. 1975, ch. 38, par. 9–1, armed robbery, Ill. Rev.Stat.1975, ch. 38, par. 18–2, and burglary, Ill.Rev.Stat.1975, ch. 38, par. 19–1. Petitioner's co-defendant, Lonzell Stone, was tried in the same proceeding without a jury in a bench trial and found guilty of the same offenses. Petitioner was sentenced to a term of 60 to 90 years' imprisonment, and Stone was sentenced to a term of 25 to 50 years. On appeal to the state appellate court, petitioner's convictions were vacated, and the case was remanded for an evidentiary hearing to determine whether an independent origin existed for a witness' in-court identification of petitioner. *People v. McTush*, 78 Ill.App.3d 603, 34 Ill.Dec. 7, 397 N.E.2d 463 (1979). Finding that an independent basis existed for the witness' in-court identification, the Illinois Supreme Court reversed the appellate court and reinstated the convictions. *People v. McTush*, 81 Ill.2d 513, 43 Ill.Dec. 728, 410 N.E.2d 861 (1980).

Petitioner's convictions arose out of an incident which occurred around 5:00 p.m. on February 20, 1976. On that date, two men were seen leaving a brown 1969 Oldsmobile and entering the Kar-Life Battery Shop at 6959 South Ashland in Chicago. An 11-year-old boy by the name of Terrence Watson was playing in the street in front of the battery shop at the time the two men arrived. Terrence testified at trial that he looked through the window of the battery shop and saw David Thomas, an employee of the shop, punch petitioner

in the mouth. Terrence then saw petitioner shoot Thomas several times and remove what was asserted at trial to be the shop's cash receipts from Thomas' jacket pocket. Terrence testified he saw Stone go to the rear of the shop and then heard more gunfire. When petitioner and Stone left the shop, they looked directly at Terrence as they walked to their car. Seeing them approach, Terrence ran in a direction opposite from his home. After Terrence watched the men depart in a brown car, he returned home and told his mother, Mrs. Ira Watson, what he had seen. Mrs. Watson telephoned the police.

Upon entering the battery shop, Chicago Police Officers Meier and Santucci discovered the body of David Thomas on the floor near the front of the shop. Officer Meier then walked to the work area of the building where he found the body of Dennis Harrison. Thomas and Harrison had been shot several times at close range. None of the shop's cash receipts which Thomas typically held in his pockets could be located on the victim.

Mrs. Watson testified at trial that after hearing noises that sounded like gunfire, she looked from her apartment window facing the shop and saw a man in a green coat fitting the description of Stone enter the store and go to the rear work area. She then heard additional gunfire-type noises. Shortly thereafter, she saw a man in a grey jacket who she testified "strongly resembled" petitioner exit the shop followed by the man in the green jacket. The two men walked to the street corner and turned out of her sight.

Mrs. Watson testified Terrence arrived shortly after the men departed and appeared "very frightened" and "stunned." Mrs. Watson asked Terrence if David Thomas was target shooting with his gun. Terrence said no. Terrence then told her, "Those dudes killed him!" Mrs. Watson testified that later that night her son remained frightened and would not sleep apart from his parents.

On March 18, 1976, Terrence and Mrs. Watson were taken to view a lineup composed of five black males of similar height. Petitioner was one of the five men. According to the testimony of a police officer present at the lineup, Terrence appeared very afraid and reluctant to speak. Terrence did not identify any of the men at the lineup. Mrs. Watson, however, told police one of the men "strongly resembled" the man in the grey jacket. This man was the petitioner.

On May 24, 1976, Terrence and Mrs. Watson met with police officers and prosecutors from the State's Attorney's Office prior to giving testimony before a grand jury. After Mrs. Watson was escorted out of the room, Terrence was shown a photograph of a five-man lineup that included Lonzell Stone which was held a day after the shooting occurred. At the time of that lineup, Terrence and his mother did not make any identifications. Upon being shown the photograph, however, Terrence identified one of the men as being the assailant who wore the green coat. Terrence told the interviewers he knew the man from his neighborhood as "Stone" and that the assailant was an acquaintance of his older brother. Terrence was then shown a series of six photographs including one of the petitioner. Terrence pointed to the photograph of the petitioner and stated he was the man who accompanied Stone on the day in question. Terrence recognized petitioner as a man he had seen before the shootings in his neighborhood in the company of Stone. Terrence, however, did not know the petitioner's name. The boy told the interviewing officers that he previously recognized both men in the earlier lineups but was afraid to make identifications because he feared the men knew him and would harm him.

After Terrence made the identifications, Mrs. Watson was returned to the room and, in the presence of her son, was shown the same photographs. Mrs. Watson was unable to make any positive identifications but indicated that a particular man in the lineup photograph had all the physical characteristics of the man she saw wearing the green coat on the day in question. The

man she referred to in the lineup photograph was Stone. After seeing the six individual photographs, she selected the petitioner's picture stating that petitioner "strongly resembled" the man in the gray jacket she witnessed leaving the battery shop.

At a hearing on petitioner's motion to suppress Terrence's out-of-court identifications of petitioner, the trial court ruled the May 24, 1976 photographic identification of the petitioner was obtained in an impermissibly suggestive manner and was thus inadmissible at trial. The court noted, however, Terrence would be permitted to make an in-court identification of the petitioner if evidence existed showing Terrence had an independent origin for making such an identification aside from the photographs he was shown on May 24, 1976. Terrence was called as a witness at the hearing and was asked questions concerning how he had come to identify petitioner as one of the assailants. Terrence testified that he used to see the petitioner sitting at a house across the street from his home where Stone lived. After hearing this statement, the judge stopped the hearing and ruled that Terrence had an independent basis upon which he could make an in-court identification of the petitioner. The judge informed the prosecution it would be forbidden from offering any evidence regarding the May 24 identification and advised defense counsel cross-examination of Terrence would be permitted at trial to allow the jury to weigh the believability of the boy's in-court identification.

At trial, petitioner's attorney cross-examined Terrence concerning the May 24, 1976 photographic identification of Stone but did not question Terrence about his pretrial identification of petitioner. The trial judge, during a side bar, instructed the petitioner's attorney that while he was entitled to cross-examine Terrence concerning the May 24, 1976 photographic identification of petitioner, if he did so, the court would lift the suppression order and allow the State to show the previous identification. Petitioner's counsel raised no objection to the side bar instruction and chose not to open

the issue during cross-examination. Aside from this, petitioner's counsel was not limited by the trial court in any other manner during the course of Terrence's cross-examination. Aside from relating the testimony described earlier in this opinion, Terrence testified that he did not tell the police that he knew the petitioner soon after he witnessed the shooting because he was afraid. Terrence also testified he saw petitioner on four or five occasions in front of Stone's house which was located across the street from where Terrence lived.

## II. DISCUSSION

Petitioner asserts that his in-court identification by Terrence Watson deprived petitioner of due process of the law since impermissibly suggestive conduct by police created a substantial likelihood of an irreparable misidentification. Petitioner argues that after finding impermissibly suggestive procedures had been employed, the trial court erred in failing to fully, fairly and adequately develop the facts necessary to determine whether Terrence's in-court identification was reliable. Petitioner asks this Court to deny respondents' motion for summary judgment and order an evidentiary hearing to explore the reliability of Terrence's identification.

In *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court specifically rejected a *per se* test which would have operated to exclude all identification testimony regardless of reliability whenever an identification may have resulted from unnecessarily suggestive procedures. Instead, the *Manson* Court adopted a "totality of the circumstances test." *Id.* at 110, 97 S.Ct. at 2250. Under this test, identification evidence is admitted if, despite being suggestive, the identification possesses certain features of reliability. *Id.* The factors upon which the reliability determination shall be made include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the

criminal; (4) the level of certainty demonstrated at the identification; and (5) the time between the crime and the identification. Illinois courts include an additional factor under the totality test: "any acquaintance with the suspect prior to the crime." *People v. Blumenshine*, 42 Ill.2d 508, 250 N.E.2d 152, 155 (1969). Against these factors, the corrupting effect of the suggestive identification procedures is to be weighed. *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253.

■ As an initial note, a reviewing court may consider testimony given at trial when examining the propriety of a suppression ruling. *Hill v. Wyrick*, 432 F.Supp. 1282, 1283 (E.D.Mo.1977), *aff'd*, 570 F.2d 748 (8th Cir.1978). Accordingly, the question this Court must address is whether the testimony adduced at trial shows the in-court identification of petitioner possessed sufficient features of reliability to overcome the possibility that suggestive conduct might have resulted in a misidentification.

■ Turning to the first factor, petitioner argues that no direct evidence was introduced at trial concerning the lighting conditions under which Terrence could have observed the assailants on the day in question. Although this may be true, the testimony at trial did show Terrence had a sufficient opportunity to view petitioner on the day of the shootings. Terrence testified that he walked up to the window of the battery shop and saw at rather close proximity a man in a grey jacket bleeding from his lip after being punched in the mouth by the shop employee, David Thomas. Terrence testified he saw the man in the grey jacket pull a gun and fire four or five shots directly at Thomas. Terrence then watched the man standing over Thomas as he searched through the victim's pockets. The boy also testified he was standing on the sidewalk in front of the shop window when the assailants left the building. When the men began walking toward Terrence, looking directly at him, the child testified that he ran. Terrence's testimony demonstrates that he viewed petitioner from several different angles at close

ranges. Terrence saw petitioner while he was inside the front office of the shop as well as in front of the building when petitioner walked toward him. Given that petitioner's counsel made no attempt to show at trial that it was too dark for Terrence to see petitioner at such close proximities, this Court concludes Terrence had a sufficient opportunity to view petitioner at the time of the offenses.

Terrence's testimony also reveals his high degree of attention during the commission of the offenses. Terrence's vivid description of how petitioner's lip bled when he was struck by Thomas, how petitioner kept firing at Thomas after the victim had fallen to the floor, and how petitioner and Stone calmly walked out of the building and down the sidewalk toward him clearly shows Terrence's alertness in observing the event.

Addressing the third factor, petitioner points to various alleged discrepancies between Terrence's trial testimony and his statements to police shortly after the offenses. Petitioner contends that such discrepancies clearly show the unreliability of Terrence's in-court identification. As an initial point, this Court's examination of the police report alleged to contain the conflicting statements of Terrence shows nothing more than a police officer's own summary of the events after talking to several witnesses. Nothing resembling a signed narrative statement by Terrence was taken by police on the night of the offenses. During petitioner's cross-examination of Terrence at trial, petitioner showed Terrence the conflicting police report and asked Terrence if he had made certain statements to the police. Terrence responded to each conflicting statement stating he had not given the police the inconsistent facts recorded in the officer's summary. Thus, it is entirely possible the officer did not accurately summarize the witness' statements when he actually wrote the report.

Even assuming Terrence did make some inconsistent statements, the conflicts highlighted by petitioner are not serious enough to question the competency of Ter-

rence's in-court identification. Experience teaches that numerous discrepancies can be illicited by skilled counsel during the course of almost any witness' testimony. The fact that the 11–year–old boy may have first described petitioner as an 18–to–20–year–old man wearing a black coat when later testimony described petitioner as being in his late 20s and wearing a grey jacket does not dictate a finding of unreliability.

The fourth *Manson* factor also weighs against granting petitioner's writ. The record shows Terrence expressed no uncertainty on May 24, 1976 that petitioner was the man he had observed with Stone at the battery shop on the day of the offenses. Terrence told the interviewers at the May 24 meeting that petitioner was the same man he had seen in the March 18, 1976 lineup. When asked why he did not identify the petitioner earlier, Terrence responded that he was afraid the petitioner knew him and would hurt him. Terrence also stated that he had seen petitioner in his neighborhood on several occasions before the offenses. Given the brutality of the crime, Terrence's age, and the fact the boy had seen petitioner in his neighborhood before February 20, 1976, Terrence's initial reluctance to identify petitioner is more than understandable. As such, the boy's failure to identify petitioner at the March 18, 1976 lineup does not raise sufficient uncertainty to render subsequent identifications by Terrence unreliable.

Fifth, while more than three months elapsed between the offenses and the photographic identification, Terrence did state at the May 24 meeting that he recognized petitioner at the intervening March 18, 1976 lineup. Case law reveals that longer lapses of time between the crime and identification have not necessitated findings of unreliability. *See Neil v. Biggers*, 409 U.S. 188, 200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972) (seven-month delay); *United States v. Cowsen*, 530 F.2d 734, 737 (7th Cir.1975) (five-month interval). The delay experienced in this case does not seriously undermine the reliability of Terrence's in-court identification of petitioner. Finally, Terrence's testimony that he had seen petitioner on four to five occasions prior to the offenses in his neighborhood provides additional assurance that Terrence's in-court identification of petitioner was reliable.

Balancing the foregoing indicia of reliability against the effect of the asserted suggestive conduct, this Court is compelled to reach the same conclusion as did the Illinois Supreme Court. Although the trial court may not have heard sufficient evidence at the suppression hearing to make a fair determination of reliability under the test in *Manson*, this error does not require that petitioner's writ issue. The trial testimony in this case shows Terrence's in-court identification of petitioner possessed sufficient features of reliability to overcome the possibility that the asserted suggestive conduct might have resulted in an irreparable misidentification. Accordingly, petitioner's Writ of Habeas Corpus must be denied.

## CONCLUSION

For the foregoing reasons, this Court grants respondents' motion for summary judgment.

IT IS SO ORDERED.